[No. 48331–1.   En Banc.   January 6, 1983.]

CERTIFICATION FROM THE
UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
IN
LEONARD HARBESON, ET AL, *Plaintiffs,* v. PARKE–DAVIS,
INC., ET AL, *Defendants.*

*Mann, King, Bingham, Scraggin, Manger & Pemberton,* by *Samuel H. Pemberton, Jr.,* for plaintiffs.

*M. Faith Burton, U. S. Department of Justice,* for defendants.

*Bryan P. Harnetiaux* and *Robert H. Whaley* on behalf of Washington Trial Lawyers Association and *John A. Rosendahl* and *Jeffrey P. Smith* on behalf of Washington Medical Association, amici curiae.

PEARSON, J.—This case requires us to decide whether to recognize two new causes of action: "wrongful birth" and "wrongful life." We hold that, subject to the limitations set forth in this opinion, such actions may be brought in this state.

Plaintiffs brought against the United States an action for medical malpractice and failure to inform of the material risks of treatment. The action was based upon medical care that plaintiff Jean Harbeson received from physicians employed by the United States at Madigan Army Medical Center in 1972 and 1973. The case was tried during the week of November 30, 1981, in the United States District Court for the Western District of Washington, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2674–2680, § 1346(b), and § 2402 (1976). After hearing all the evidence and before giving judgment, the District Court, on its own motion, certified to this court questions of law pursuant to RCW 2.60.020 and RAP 16.16. The District Court formulated from the evidence presented at trial a number of findings of fact and conclusions of law. These findings and conclusions comprise the record upon which we must resolve the issues certified.

The District Court found as follows. Plaintiff Leonard Harbeson has at all material times been a member of the United States Air Force. In 1970, while Mr. Harbeson was stationed at Malstrom Air Force Base, his wife Jean conceived their first child. In December 1970, Mrs. Harbeson learned, after suffering a grand mal seizure, that she was an epileptic. To control Mrs. Harbeson's seizures, physicians at the air force base prescribed Dilantin, an anticonvulsant drug, which was the first choice of doctors in the treatment of epilepsy. Mrs. Harbeson took Dilantin during the remainder of her pregnancy and in March 1971 gave birth to Michael, a healthy and intelligent child.

After Michael's birth, Mr. Harbeson was transferred to McChord Air Force Base, near Tacoma. The medical facility serving the base was Madigan Army Medical Center. In May 1972, Mrs. Harbeson went to Madigan for evaluation

and treatment of her epilepsy. A neurologist at Madigan prescribed Dilantin *to control* her seizures. Between November 1972 and July 1973, the Harbesons informed three doctors at Madigan that they were considering having other children, and inquired about the risks of Mrs. Harbeson's taking Dilantin during pregnancy. Each of the three doctors responded that Dilantin could cause cleft palate and temporary hirsutism. None of the doctors conducted literature searches or consulted other sources for specific information regarding the correlation between Dilantin and birth defects. The Harbesons relied on the assurances of the Madigan doctors and thereafter Mrs. Harbeson became pregnant twice, giving birth to Elizabeth in April 1974, and Christine in May 1975. Throughout these pregnancies, Mrs. Harbeson continued to take Dilantin as prescribed by the Madigan doctors.

Elizabeth and Christine are the minor plaintiffs in this action, and are represented by Leonard Harbeson, as guardian ad litem. Elizabeth and Christine have been diagnosed as suffering from "fetal hydantoin syndrome." They suffer from mild to moderate growth deficiencies, mild to moderate developmental retardation, wide–set eyes, lateral ptosis (drooping eyelids), hypoplasia of the fingers, small nails, low–set hairline, broad nasal ridge, and other physical and developmental defects. Had Mr. and Mrs. Harbeson been informed of the potential birth defects associated with the use of Dilantin during pregnancy, they would not have had any other children.

The District Court's conclusions of law include the following.

4. Dilantin was a proximate cause of the defects and anomalies suffered by Elizabeth and Christine Harbeson.

5. The physicians at Madigan were the agents of the Defendant United States of America, and said Defendant is responsible for the acts and omissions of the Madigan physicians.

6. Plaintiff, Leonard Harbeson, is the duly appointed guardian ad litem for the minor plaintiffs herein, Elizabeth and Christine Harbeson, and is authorized to bring

the present action on their behalf.

7. The physicians at Madigan failed to conduct a literature search or to consult other sources in regard to the effects of Dilantin during pregnancy, even though the plaintiffs Leonard and Jean Harbeson specifically asked all three Madigan physicians of possible birth defects associated with the mother's consumption of Dilantin during pregnancy. Said acts of the Madigan physicians:

a. breached the standard of care for the average physician acting under the same or similar circumstances, and the physicians were thereby negligent;

b. were not reasonably prudent, and therefore, were negligent.

8. An adequate literature search, or consulting other sources, would have yielded such information of material risks associated with Dilantin in pregnancy that reasonably prudent persons in the position of the Harbesons would attach significance to such risks in deciding whether to have further children.

9. Each of the four Harbeson Plaintiffs has sustained permanent and severe damages and injuries past, present and future, as a direct and proximate result of the negligence of the Madigan physicians.

10. Plaintiffs are entitled to recover damages from the Defendant United States of America.

The District Court has certified to us the following issues:

1. May Plaintiff parents Leonard and Jean Harbeson maintain a "wrongful birth" action?

2. If the answer to question number one is "yes",

a. Are the claims of Leonard and Jean Harbeson controlled by RCW 4.24.010 and/or RCW 4.24.290?

b. May Leonard and Jean Harbeson recover damages?

3. May Plaintiff children Elizabeth and Christine Harbeson maintain a "wrongful life" claim?

4. If the answer to question number three is "yes",

a. Are the claims of Elizabeth and Christine Harbeson controlled by RCW 4.24.290?

b. May Elizabeth and Christine Harbeson recover damages?

We will consider in turn wrongful birth and wrongful life actions.

## WRONGFUL BIRTH

■ The epithet wrongful birth has been used to describe several fundamentally different types of action. *See* Annot., *Tort Liability for Wrongfully Causing One To Be Born,* 83 A.L.R.3d 15 (1978). Many of the actions once entitled wrongful birth are now referred to as wrongful conception and wrongful pregnancy actions. *Phillips v. United States,* 508 F. Supp. 544, 545 n.1 (D.S.C. 1981); Rogers, *Wrongful Life and Wrongful Birth: Medical Malpractice in Genetic Counseling and Prenatal Testing,* 33 S.C. L. Rev. 713, 739–41 (1982). A recent definition of a wrongful birth action is an action brought by parents against

> a physician [who] failed to inform [them] of the increased possibility that the mother would give birth to a child suffering from birth defects . . . [thereby precluding] an informed decision about whether to have the child.

(Footnotes omitted.) Comment, *Berman v. Allan,* 8 Hofstra L. Rev. 257, 257–58 (1979), cited in *Phillips,* at 545 n.1.

Such an action was recognized by the New Jersey Supreme Court in *Schroeder v. Perkel,* 87 N.J. 53, 432 A.2d 834 (1981). Mr. and Mrs. Schroeder had two children, both of whom suffered from cystic fibrosis, a fatal genetic disorder. It was not until Mrs. Schroeder was 8 months pregnant with their second child that the Schroeders learned they were carriers of the recessive gene which causes the disorder. They claimed that defendant pediatricians were negligent in failing to make an earlier diagnosis of cystic fibrosis in their first child. Had they known earlier of the condition, the Schroeders would have either avoided the conception of their second child, or terminated the pregnancy. The basis of their claim, therefore, was that "they were deprived of an informed choice of whether to assume the risk of a second child." 87 N.J. at 57. The New Jersey Supreme Court recognized the cause of action and held that the parents could recover extraordinary medical expenses of raising the second child.

*Schroeder* is a paradigm wrongful birth case. The parents

brought an action for the birth of a defective child. They claimed that defendant physicians had breached a duty to inform them of the risk of the child's being born defective. They claimed that had they known of this risk they would have prevented the birth of the child by contraception or abortion. They claimed that defendants' failure to inform was a proximate cause of the birth of the child and that the birth was an injury compensable in damages.

Although the definition we refer to above comprehends the *Schroeder* action, it excludes the cause of action recognized in a similar case, *Speck v. Finegold,* 497 Pa. 77, 439 A.2d 110 (1981). Mr. Speck suffered from neurofibromatosis, a disorder caused by a genetic defect. After having two children who suffered from the disorder, Mr. Speck decided to undergo a vasectomy. The vasectomy was unsuccessful, and Mrs. Speck became pregnant. Mr. and Mrs. Speck decided to terminate the pregnancy. The abortion was unsuccessful, and Mrs. Speck gave birth to a daughter who suffered from neurofibromatosis.

The court allowed the parents a cause of action to recover expenses attributable to the birth and rearing of their daughter. There appears to be no reason to exclude the action in *Speck* from the definition of wrongful birth. Like *Schroeder,* it is founded upon the birth of a defective child. The parents of the child alleged defendants breached a duty of care in performing the vasectomy and abortion procedures. Had these procedures been successful, they would have prevented conception or birth of the child. The parents alleged defendant's breach was a proximate cause of the birth of the child, and that birth was an injury to the parents, compensable in damages.

Both *Schroeder* and *Speck* recognize the right of parents to prevent the conception or birth of children suffering defects. They recognize that physicians owe a duty to parents to preserve that right. Physicians may breach this duty either by failure to impart material information or by negligent performance of a procedure to prevent the birth of a defective child. The parents' right to prevent a defective

child and the correlative duty flowing from that right is the heart of the wrongful birth action.

For the purposes of the analysis which follows, therefore, wrongful birth will refer to an action based on an alleged breach of the duty of a health care provider to impart information or perform medical procedures with due care, where the breach is a proximate cause of the birth of a defective child. We do not in this opinion address issues which may arise where the birth of a healthy child is allegedly caused by a breach of duty owed to the parents. Such actions are referred to as wrongful conception or wrongful pregnancy, rather than wrongful birth. *See generally Phillips,* at 545 n.1. Other jurisdictions have consistently treated such actions as different from, although related to, wrongful birth. We do likewise.

Having defined the scope of our inquiry, we now consider whether the wrongful birth action should be allowed in this state. We conclude that the action conforms comfortably to the structure of tort principles and that recognition of wrongful birth claims is a logical and necessary development. Accordingly, we hold that wrongful birth claims will be recognized in Washington.

The first step in the analysis which leads us to this conclusion is to identify the tort principles which govern actions against providers of health care. These principles have received considerable attention from both this court and the Legislature over the past 15 years. A convenient starting point for a review of these developments is the enumeration of the elements of a negligence action against a physician, presented in *Hayes v. Hulswit,* 73 Wn.2d 796, 797, 440 P.2d 849 (1968).

> (1) Plaintiff must establish by competent evidence the standard and degree of care and skill expected of the average medical or dental practitioner, in the class to which defendant belongs, acting in the same or similar circumstances. . . .
> (2) Plaintiff's evidence must establish that defendant failed to meet this standard of care.
> (3) Plaintiff's evidence must establish that defendant's

alleged failure to meet the standard of care was a proximate cause of her alleged damage.

(4) Plaintiff's evidence must establish that she suffered damage by reason of defendant's failure to meet this standard of care.

These elements are merely particularized expressions of the four concepts fundamental to any negligence action: duty, breach, proximate cause, and damage or injury. *Hunsley v. Giard,* 87 Wn.2d 424, 434, 553 P.2d 1096 (1976).

According to *Hayes v. Hulswit,* the standard of care applicable to medical malpractice actions was the standard expected of the average practitioner in the class to which defendant belongs. This standard was modified in *Helling v. Carey,* 83 Wn.2d 514, 519 P.2d 981, 67 A.L.R.3d 175 (1974). In that case, we held that as a matter of law reasonable prudence required the giving of a test for glaucoma, irrespective of disregard of the test by the standards of the ophthalmology profession. In May 1975, the Legislature enacted a statute designed to reestablish pre–*Helling* standards of negligence. Laws of 1975, 1st Ex. Sess., ch. 35, codified as RCW 4.24.290.[1] *See Gates v. Jensen,* 92 Wn.2d 246, 595 P.2d 919 (1979) (Dolliver, J., concurring in part, dissenting in part).

The Legislature again addressed the question of medical malpractice actions a few months later, enacting Laws of 1975, 2d Ex. Sess., ch. 56, codified as RCW 7.70. This legislation limited actions against health care providers to three categories: where the plaintiff establishes negligence; where the plaintiff establishes that the health care provider promised the injury suffered would not occur; and where

---

[1]RCW 4.24.290 provides in pertinent part:

"In any civil action for damages based on professional negligence against a hospital . . . or against a member of the healing arts . . . the plaintiff in order to prevail shall be required to prove by a preponderance of the evidence that the defendant or defendants failed to exercise that degree of skill, care and learning possessed by other persons in the same profession and that as a proximate result of such failure the plaintiff suffered damages, but in no event shall the provisions of this section apply to an action based on the failure to obtain the informed consent of a patient."

the plaintiff establishes lack of informed consent. RCW 7.70.030.[2]

The standard of care embodied in RCW 4.24.290 was reiterated in RCW 7.70.040.[3] Subsequently, this court held that the "reasonable prudence" test of *Helling* had survived the enactment of these statutes, at least in certain limited circumstances. *Gates v. Jensen, supra; Keogan v. Holy Family Hosp.,* 95 Wn.2d 306, 328, 622 P.2d 1246 (1980).

Parallel to these developments in the law relating to medical negligence was the adoption by this court of the doctrine of informed consent. *See* Comment, *Informed Consent in Washington: Expanded Scope of Material Facts that the Physician Must Disclose to His Patient,* 55 Wash. L. Rev. 655 (1980). We first considered the doctrine in *ZeBarth v. Swedish Hosp. Med. Ctr.,* 81 Wn.2d 12, 23, 499 P.2d 1 (1972). We characterized informed consent as a general principle which imposed a duty on a physician to disclose information to a patient about the risks associated with proposed treatment. Failure to impart such informa-

---

[2]RCW 7.70.030 provides:

"No award shall be made in any action or arbitration for damages for injury occurring as the result of health care which is provided after June 25, 1976, unless the plaintiff establishes one or more of the following propositions:

"(1) That injury resulted from the failure of a health care provider to follow the accepted standard of care;

"(2) That a health care provider promised the patient or his representative that the injury suffered would not occur;

"(3) That injury resulted from health care to which the patient or his representative did not consent.

"Unless otherwise provided in this chapter, the plaintiff shall have the burden of proving each fact essential to an award by a preponderance of the evidence."

[3]RCW 7.70.040 provides:

"The following shall be necessary elements of proof that injury resulted from the failure of the health care provider to follow the accepted standard of care:

"(1) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider in the profession or class to which he belongs, in the state of Washington, acting in the same or similar circumstances;

"(2) Such failure was a proximate cause of the injury complained of."

tion is negligence.[4]

The doctrine was further refined in *Miller v. Kennedy,* 11 Wn. App. 272, 522 P.2d 852 (1974), *aff'd per curiam,* 85 Wn.2d 151, 530 P.2d 334 (1975). The elements of an action based on the informed consent doctrine were stated to be: "the existence of a material risk unknown to the patient, the failure to disclose it, that the patient would have chosen a different course if the risk had been disclosed and resulting injury." *Miller v. Kennedy,* 11 Wn. App. at 283. Once these elements have been established by the plaintiff, the burden falls to the defendant to prove a defense. *Miller v. Kennedy,* at 283–84. The duty to impart material information is not limited by the customs or standards of other practitioners in the community. *Miller v. Kennedy,* at 286, 288.[5]

The Legislature adopted the informed consent doctrine in its enactments in 1976. RCW 7.70.030(3). It enunciated the elements of a cause of action based on informed consent in RCW 7.70.050.[6] These elements are similar to those set

---

[4]"Informed consent, therefore, is the name for a general principle of law that a physician has a duty to disclose what a reasonably prudent physician in the medical community in the exercise of reasonable care, would disclose to his patient as to whatever grave risks of injury may be incurred from a proposed course of treatment so that a patient, exercising ordinary care for his own welfare, and faced with a choice of undergoing the proposed treatment, or alternative treatment, or none at all, can, in reaching a decision, intelligently exercise his judgment by reasonably balancing the probable risks against the probable benefits. *See* Waltz & Scheuneman, *Informed Consent to Therapy,* 64 Nw. U. L. Rev. 628 (1969–70). Failure to impart such information to the patient is by the great weight of authority deemed negligence rendering the physician liable for injuries proximately caused thereby." *ZeBarth v. Swedish Hosp. Med. Ctr.,* 81 Wn.2d at 23.

[5]"The doctor may establish the existence of a standard of nondisclosure by medical experts in his field or practice, but it is for the jury to accept or reject whether any standard of nondisclosure should deprive a patient of his right of self–determination." *Miller v. Kennedy,* 11 Wn. App. at 288.

[6]RCW 7.70.050 provides:
"(1) The following shall be necessary elements of proof that injury resulted from health care in a civil negligence case or arbitration involving the issue of the alleged breach of the duty to secure an informed consent by a patient or his rep-

out in *Miller v. Kennedy*. The Legislature also recognized that the standard to which defendants are held in informed consent cases is different from the standard appropriate to medical negligence cases. RCW 7.70.050(2). RCW 4.24.290 specifically excludes informed consent actions from its operation.

We have now arrived at the crucial issue: Does the wrongful birth action as formulated earlier in this opinion coincide with these principles by which we impose liability on providers of health care?

First, we measure the proposed wrongful birth action against the traditional concepts of duty, breach, injury, and proximate cause. The critical concept is duty. The core of our decision is whether we should impose upon health care providers a duty correlative to parents' right to prevent the birth of defective children.

Until recently, medical science was unable to provide parents with the means of predicting the birth of a defec-

---

resentatives against a health care provider:

"(a) That the health care provider failed to inform the patient of a material fact or facts relating to the treatment;

"(b) That the patient consented to the treatment without being aware of or fully informed of such material fact or facts;

"(c) That a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts;

"(d) That the treatment in question proximately caused injury to the patient.

"(2) Under the provisions of this section a fact is defined as or considered to be a material fact, if a reasonably prudent person in the position of the patient or his representative would attach significance to it deciding whether or not to submit to the proposed treatment.

"(3) Material facts under the provisions of this section which must be established by expert testimony shall be either:

"(a) The nature and character of the treatment proposed and administered;

"(b) The anticipated results of the treatment proposed and administered;

"(c) The recognized possible alternative forms of treatment; or

"(d) The recognized serious possible risks, complications, and anticipated benefits involved in the treatment administered and in the recognized possible alternative forms of treatment, including nontreatment.

"(4) If a recognized health care emergency exists and the patient is not legally competent to give an informed consent and/or a person legally authorized to consent on behalf of the patient is not readily available, his consent to required treatment will be implied."

tive child. Now, however, the ability to predict the occurrence and recurrence of defects attributable to genetic disorders has improved significantly. Parents can determine before conceiving a child whether their genetic traits increase the risk of that child's suffering from a genetic disorder such as Tay–Sachs disease or cystic fibrosis. After conception, new diagnostic techniques such as amniocentesis and ultrasonography can reveal defects in the unborn fetus. *See generally* Peters & Peters, *Wrongful Life: Recognizing the Defective Child's Right to a Cause of Action,* 18 Duq. L. Rev. 857, 873–75 (1980). Parents may avoid the birth of the defective child by aborting the fetus. The difficult moral choice is theirs. *Roe v. Wade,* 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973). We must decide, therefore, whether these developments confer upon potential parents the right to prevent, either before or after conception, the birth of a defective child. Are these developments the first steps towards a "Fascist–Orwellian societal attitude of genetic purity", *Gildiner v. Thomas Jefferson Univ. Hosp.,* 451 F. Supp. 692, 695 (E.D. Pa. 1978), or Huxley's brave new world? Or do they provide positive benefits to individual families and to all society by avoiding the vast emotional and economic cost of defective children?

We believe we must recognize the benefits of these medical developments and therefore we hold that parents have a right to prevent the birth of a defective child and health care providers a duty correlative to that right. This duty requires health care providers to impart to their patients material information as to the likelihood of future children's being born defective, to enable the potential parents to decide whether to avoid the conception or birth of such children. If medical procedures are undertaken to avoid the conception or birth of defective children, the duty also requires that these procedures be performed with due care. This duty includes, therefore, the requirement that a health care provider who undertakes to perform an abortion use reasonable care in doing so. The duty does not, however, affect in any way the right of a physician to refuse

on moral or religious grounds to perform an abortion. Recognition of the duty will "promote societal interests in genetic counseling and prenatal testing, deter medical malpractice, and at least partially redress a clear and undeniable wrong." (Footnotes omitted.) Rogers, *Wrongful Life and Wrongful Birth: Medical Malpractice in Genetic Counseling and Prenatal Testing*, 33 S.C. L. Rev. 713, 757 (1982) (hereinafter cited as Rogers).

We find persuasive the fact that all other jurisdictions to have considered this issue have recognized such a duty. These decisions are conveniently collected in Rogers, at 739–52, and we need not list them here.

Having recognized that a duty exists, we have taken the major step toward recognizing the wrongful birth action. The second element of the traditional tort analysis is more straightforward. Breach will be measured by failure to conform to the appropriate standard of skill, care, or learning. RCW 4.24.290; RCW 7.70.040. *Gates v. Jensen,* 92 Wn.2d 246, 595 P.2d 919 (1979).

More problematical is the question of whether the birth of a defective child represents an injury to the parents. The only case to touch on this question in this state did not resolve it. *Ball v. Mudge,* 64 Wn.2d 247, 250, 391 P.2d 201 (1964). However, it is an inevitable consequence of recognizing the parents' right to avoid the birth of a defective child that we recognize that the birth of such a child is an actionable injury. The real question as to injury, therefore, is not the existence of the injury, but the extent of that injury. In other words, having recognized that the birth of the child represents an injury, how do we measure damages? Other courts to have considered the issue have found this question troublesome. In particular, the New Jersey Supreme Court has taken a different approach to the question on each of the three occasions it has confronted it. In *Gleitman v. Cosgrove,* 49 N.J. 22, 227 A.2d 689 (1967), the court rejected the wrongful birth action altogether. One of the reasons for the rejection was the difficulty of measuring

damages.[7] When the court next considered the issue in *Berman v. Allan*, 80 N.J. 421, 404 A.2d 8 (1979), it upheld an action for wrongful birth and permitted damages for mental anguish. However, the court refused to allow damages to compensate for the medical and other costs incurred in raising, educating, and supervising the child. The court retreated from this position in the third case, *Schroeder v. Perkel*, 87 N.J. 53, 432 A.2d 834 (1981), and allowed the parents damages for certain medical expenses related to the child's affliction.

Other courts to have considered the issue exhibit widely divergent approaches. Comment, *Wrongful Birth Damages: Mandate and Mishandling by Judicial Fiat*, 13 Val. U. L. Rev. 127 (1978); Rogers, at 750–51.[8]

█ More certain guidance than that provided by decisions of other jurisdictions on the issue of damages is provided by the Legislature in RCW 4.24.010.[9] This statute

---

[7] "[A] court would have to evaluate the . . . intangible, unmeasurable, and complex human benefits of motherhood and fatherhood and weigh these against the alleged emotional and money injuries. Such a proposed weighing is . . . impossible to perform". 49 N.J. at 29.

[8] "Courts generally allow the extraordinary expenses relating to the child's defect that must be borne by the parents [*e.g., Jacobs v. Theimer*, 519 S.W.2d 846 (Tex. 1975); *Dumer v. St. Michael's Hosp.*, 69 Wis. 2d 766, 233 N.W.2d 372 (1975)], and some courts have compensated for the parents' pain and suffering or mental anguish. [*Schroeder v. Perkel, supra.*] One court has allowed all expenses incident to the care of the child, without discounting those expenses not directly related to the child's defect that would be necessary for a normal child [*Robak v. United States*, 658 F.2d. 471 (7th Cir. 1981)]." (Footnotes omitted.) Rogers, at 751. *See also Becker v. Schwartz*, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978) (allowing pecuniary but denying emotional damages); *Speck v. Finegold*, 497 Pa. 77, 439 A.2d 110 (1981) (allowing pecuniary and emotional damages).

[9] RCW 4.24.010 provides, in part:
"The mother or father or both may maintain an action as plaintiff for the injury or death of a minor child, or a child on whom either, or both, are dependent for support . . .
" . . .
"In such an action, in addition to damages for medical, hospital, medication expenses, and loss of services and support, damages may be recovered for the loss of love and companionship of the child and for injury to or destruction of the

provides that, in an action by parents for injury to a child, compensation may be recovered for four types of damages: medical, hospital, and medication expenses, loss of the child's services and support, loss of the child's love and companionship, and injury to the parent–child relationship. Recovery of damages for loss of companionship of the child, or injury or destruction of the parent–child relationship is not limited to the period of the child's minority. *Balmer v. Dilley,* 81 Wn.2d 367, 502 P.2d 456 (1972). We have held that this section allows recovery for parental grief, mental anguish, and suffering. *Hinzman v. Palmanteer,* 81 Wn.2d 327, 501 P.2d 1228 (1972). The statute is not directly in point because a wrongful birth claim does not allege injury to the child as the cause of the parents' injury; rather it alleges the birth of the child is the cause of the injury. Nevertheless, the statute reflects a policy to compensate parents not only for pecuniary loss but also for emotional injury. There appears to be no compelling reason that policy should not apply in wrongful birth actions. Accordingly, we hold that recovery may include the medical, hospital, and medication expenses attributable to the child's birth and to its defective condition, and in addition damages for the parents' emotional injury caused by the birth of the defective child. In considering damages for emotional injury, the jury should be entitled to consider the countervailing emotional benefits attributable to the birth of the child. Restatement (Second) of Torts § 920 (1977). Rogers, at 751–52; *Eisbrenner v. Stanley,* 106 Mich. App. 357, 308 N.W.2d 209 (1981); *Kingsbury v. Smith,* 442 A.2d 1003 (N.H. 1982).

■ The final element to be considered is whether a breach of duty can be a proximate cause of the birth of the child. Proximate cause must be established by, first, a showing that the breach of duty was a cause in fact of the injury, and, second, a showing that as a matter of law lia-

---

parent–child relationship in such amount as, under all the circumstances of the case, may be just."

bility should attach. *King v. Seattle,* 84 Wn.2d 239, 249, 525 P.2d 228 (1974). Cause in fact can be established by proving that but for the breach of duty, the injury would not have occurred. *King v. Seattle, supra.* The legal question whether liability should attach is essentially another aspect of the policy decision which we confronted in deciding whether the duty exists. We therefore hold that, as a matter of law in wrongful birth cases, if cause in fact is established, the proximate cause element is satisfied. This conclusion is consistent with the decisions of those other jurisdictions which have accepted wrongful birth actions, *e.g., Robak v. United States,* 658 F.2d 471 (7th Cir. 1981).

The action for wrongful birth, therefore, fits within the conceptual framework of our law of negligence. An action in negligence claiming damages for the birth of a child suffering congenital defects may be brought in this state.

We now turn to answer the first issue certified to us by the District Court. Our analysis leads us to conclude that plaintiffs Leonard and Jean Harbeson may maintain a cause of action for the wrongful births of Elizabeth and Christine. We have held above that physicians have a duty to protect their patient's right to prevent the birth of defective children. This duty requires physicians to act in accordance with the appropriate standard of care. The special standard of care formulated in *Helling v. Carey,* 83 Wn.2d 514, 519 P.2d 981, 67 A.L.R.3d 175 (1974) had not been promulgated at the time the alleged negligence of the physicians occurred in 1972 and 1973. The standard which applied at that time was set forth in *Hayes v. Hulswit,* 73 Wn.2d 796, 440 P.2d 849 (1968), the standard of the "average practitioner." The District Court concluded that the physicians' failure to conduct a literature search breached the standard of care of the "average physician." Conclusion of law 7a. The physicians therefore breached the duty of care they owed to Mr. and Mrs. Harbeson.

Moreover, as our analysis above indicates, the birth of children suffering congenital defects constitutes an actionable injury to the parents. The three elements of duty,

breach, and injury are therefore established.

The final element which must be proved is that the negligence of the physicians was a proximate cause of this injury. The District Court concluded that Dilantin was the proximate cause of the birth defects suffered by the children (conclusion of law 4) and that an adequate literature search would have revealed the risks associated with Dilantin (conclusion of law 8). The court made a finding of fact that had the Harbesons been informed of those risks they would not have had any other children. These conclusions and findings establish that the breach of duty was a cause in fact of the birth of Elizabeth and Christine, and therefore a proximate cause of the injury.

The parents may therefore recover damages for the wrongful births of Elizabeth and Christine. These damages may include pecuniary damages for extraordinary medical, educational, and similar expenses attributable to the defective condition of the children. In other words, the parents should recover those expenses in excess of the cost of the birth and rearing of two normal children. In addition, the damages may compensate for mental anguish and emotional stress suffered by the parents during each child's life as a proximate result of the physicians' negligence. Any emotional benefits to the parents resulting from the birth of the child should be considered in setting the damages. (Implicit in this conclusion, in response to the District Court's question 2a, is that neither RCW 4.24.290 nor RCW 4.24.010 applies directly to the claims of the Harbesons.)

Mr. and Mrs. Harbeson also have a cause of action on a theory of informed consent. The health care which gives rise to the cause of action occurred between November 1972 and July 1973. At that time, the doctrine of informed consent was governed by *ZeBarth v. Swedish Hosp. Med. Ctr.*, 81 Wn.2d 12, 499 P.2d 1 (1972). The doctrine required the physicians, in treating Mrs. Harbeson with Dilantin, to exercise reasonable care in disclosing "grave risks" of that treatment. It appears from the findings and conclusions of the District Court that the potential teratogenetic effects of

Dilantin would constitute a "grave risk" of which Mrs. Harbeson ought to have been informed in order to intelligently exercise her judgment whether to have further children. Failure to impart the information renders the physicians liable for injuries proximately caused by the failure. As we explained in our discussion of the negligence action, the failure to inform was a proximate cause of the births of the minor plaintiffs. Mr. and Mrs. Harbeson are entitled to damages for pecuniary and emotional injuries attributable to those births.

### WRONGFUL LIFE

In a wrongful life claim,

[t]he child does not allege that the physician's negligence caused the child's deformity. Rather, the claim is that the physician's negligence—his failure to adequately inform the parents of the risk—has caused the *birth* of the deformed child. The child argues that *but for* the inadequate advice, it would not have been born to experience the pain and suffering attributable to the deformity.

Comment, *"Wrongful Life": The Right Not To Be Born,* 54 Tul. L. Rev. 480, 485 (1980).

To this definition we would add that the physician's negligence need not be limited to failure to adequately inform the parents of the risk. It may also include negligent performance of a procedure intended to prevent the birth of a defective child: sterilization or abortion.

Wrongful life is the child's equivalent of the parents' wrongful birth action. However, whereas wrongful birth actions have apparently been accepted by all jurisdictions to have considered the issue, wrongful life actions have been received with little favor. There is an excellent discussion of the law relating to recognition of an action for wrongful life in *Curlender v. Bio-Science Labs.,* 106 Cal. App. 3d 811, 165 Cal. Rptr. 477 (1980). The action has been rejected in Alabama, *Elliott v. Brown,* 361 So. 2d 546 (Ala. 1978); New Jersey, *Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979); New York, *e.g., Becker v. Schwartz,* 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978); South Caro-

lina, *Phillips v. United States,* 508 F. Supp. 537 (D.S.C. 1980); Texas, *Jacobs v. Theimer,* 519 S.W.2d 846 (Tex. 1975); and Wisconsin, *Dumer v. St. Michael's Hosp.,* 69 Wis. 2d 766, 233 N.W.2d 372 (1975).

Two other jurisdictions have come closer to embracing the cause of action. In Pennsylvania, a trial court decision that the action was not legally cognizable was affirmed only as a result of the even division of the Supreme Court. *Speck v. Finegold,* 497 Pa. 77, 439 A.2d 110 (1981). The Supreme Court of California rejected the claim of a child for general damages, but allowed the recovery of extraordinary medical expenses occasioned by the child's defect. *Turpin v. Sortini,* __ Cal. 3d __, 643 P.2d 954, 182 Cal. Rptr. 337, 348 (1982). The court acknowledges that "it would be illogical and anomalous to permit only parents, and not the child, to recover for the cost of the child's own medical care."[10] We agree. The child's need for medical care and other special costs attributable to his defect will not miraculously disappear when the child attains his majority. In many cases, the burden of those expenses will fall on the child's parents or the state. Rather than allowing this to occur by refusing to recognize the cause of action, we prefer to place the burden of those costs on the party whose negligence was in fact a proximate cause of the child's continuing need for such special medical care and training.

We hold, accordingly, that a child may maintain an action for wrongful life in order to recover the extraordinary expenses to be incurred during the child's lifetime, as

---

[10]The court goes on to say: "If such a distinction were established, the afflicted child's receipt of necessary medical expenses might well depend on the wholly fortuitous circumstance of whether the parents are available to sue and recover such damages or whether the medical expenses are incurred at a time when the parents remain legally responsible for providing such care.

"Realistically, a defendant's negligence in failing to diagnose an hereditary ailment places a significant medical and financial burden on the whole family unit. Unlike the child's claim for general damages, the damage here is both certain and readily measurable. Furthermore, in many instances these expenses will be vital not only to the child's well-being but to his or her very survival." (Footnote omitted.) *Turpin v. Sortini,* 182 Cal. Rptr. at 348.

a result of the child's congenital defect. Of course, the costs of such care for the child's minority may be recovered only once. *Wooldridge v. Woolett,* 96 Wn.2d 659, 666, 638 P.2d 566 (1981). If the parents recover such costs for the child's minority in a wrongful birth action, the child will be limited to the costs to be incurred during his majority.

The analysis whereby we arrived at our holding is similar to that which we used in considering the parents' wrongful birth action. It is convenient therefore to consider wrongful life according to the four traditional tort concepts of duty, breach, injury, and proximate cause.

█ We begin with duty. The first potential difficulty with this element of a wrongful life action is that in every case the alleged negligent act will occur before the birth of the child, and in many cases (including the one before us) before the child is conceived. Prenatal injuries to a fetus have been recognized as actionable in this state for 20 years. *Seattle–First Nat'l Bank v. Rankin,* 59 Wn.2d 288, 367 P.2d 835 (1962). We have not previously considered whether a duty could exist prior to conception. Other courts have recognized such a preconception duty. *E.g., Turpin v. Sortini, supra,* and authorities cited therein. We now hold that a duty may extend to persons not yet conceived at the time of a negligent act or omission. Such a duty is limited, like any other duty, by the element of foreseeability. *Hunsley v. Giard,* 87 Wn.2d 424, 435–36, 553 P.2d 1096 (1976).[11] A provider of health care, or anyone else, will be liable only to those persons foreseeably endangered by his conduct. In most wrongful life cases, it should not be difficult to establish foreseeability. In the case before

---

[11]"The element of foreseeability plays a large part in determining the scope of defendant's duty. *Wells v. Vancouver,* 77 Wn.2d 800, 467 P.2d 292 (1970). The point is summarized by the Hawaii Supreme Court: '[A] further limitation on the right of recovery, as in all negligence cases, is that the defendant's obligation to refrain from particular conduct is owed only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous.' *Rodrigues v. State,* 52 Hawaii 156, 174, 472 P.2d 509 (1970)." *Hunsley v. Giard,* 87 Wn.2d at 435–36.

us, for example, the parents informed the defendant physicians of their intention to have further children. Such future children were therefore foreseeably endangered by defendants' failure to take reasonable steps to determine the danger of prescribing Dilantin for their mother.

One reason for the reluctance of other jurisdictions to recognize a duty to the child appears to be the attitude that to do so would represent a disavowal of the sanctity of a less than perfect human life. *Berman v. Allan,* 80 N.J. at 430. This reasoning was rejected in *Turpin v. Sortini,* 182 Cal. Rptr. at 344–45.

> [I]t is hard to see how an award of damages to a severely handicapped or suffering child would "disavow" the value of life or in any way suggest that the child is not entitled to the full measure of legal and nonlegal rights and privileges accorded to all members of society.

We agree.

Furthermore, the policies which persuaded us (along with several other jurisdictions) to recognize parents' claims of wrongful birth apply equally to recognition of claims of wrongful life. Imposition of a corresponding duty to the child will similarly foster the societal objectives of genetic counseling and prenatal testing, and will discourage malpractice. In a footnote, the court in *Turpin v. Sortini* wrote at 182 Cal. Rptr. 349 n.15:

> Permitting recovery of these extraordinary out-of-pocket expenses whether the cost is to be borne by the parents or the child should also help ensure that the available tort remedies in this area provide a comprehensive and consistent deterrent to negligent conduct.

In addition to providing a comprehensive and consistent deterrent to malpractice, recognition of the duty will provide more comprehensive and consistent compensation for those injured by such malpractice (at least for extraordinary out-of-pocket expenses) than would be available were the duty confined to the parents. In order to achieve these ends, therefore, we recognize the existence of a duty to the unborn or unconceived child.

This duty will be breached by failure to observe the appropriate standard of care. *See* Rogers, at 332–33.

The most controversial element of the analysis in other jurisdictions has been injury and the extent of damages. The New Jersey Supreme Court gave two reasons for rejecting a child's wrongful life claim in *Berman v. Allan.* First, the quantum of damages in such an action would be impossible to compute because the trier of fact would be required to "measure the difference in value between life in an impaired condition and the 'utter void of nonexistence.'" 80 N.J. at 427. Second, to recognize life itself as an actionable injury would be inimical to deeply held beliefs that life is more precious than nonlife.

■ We agree with the New Jersey court that measuring the value of an impaired life as compared to nonexistence is a task that is beyond mortals, whether judges or jurors. However, we do not agree that the impossibility of valuing life and nonexistence precludes the action altogether. General damages are certainly beyond computation. They are therefore incapable of satisfying the requirement of Washington law that damages be established with "reasonable certainty." *Dyal v. Fire Cos. Adj. Bur., Inc.,* 23 Wn.2d 515, 521, 161 P.2d 321 (1945). But one of the consequences of the birth of the child who claims wrongful life is the incurring of extraordinary expenses for medical care and special training. These expenses are calculable. Thus, although general damages are impossible to establish with reasonable certainty, such special damages can be proved. In respect of special damages, therefore, the objection advanced in *Berman v. Allan* is not persuasive.

The second objection advanced by the New Jersey court in *Berman v. Allan* we have already discussed. Suffice it to say here that we do not agree that requiring a negligent party to provide the costs of health care of a congenitally deformed child is a disavowal of the sanctity of human life.

The final element which requires consideration is proximate cause.

■ The causation issue in a wrongful life claim is

whether "[b]ut for the physician's negligence, the parents would have avoided conception, or aborted the pregnancy, and the child would not have existed." Comment, 54 Tul. L. Rev. at 491. Some early cases advanced a proximate cause argument based on the fact that the negligence of the physician did not cause the defect from which the plaintiff suffered; rather, the negligence was in failing to disclose the existence of the defect. *E.g., Gleitman v. Cosgrove,* 49 N.J. 22, 27–28, 227 A.2d 689 (1967). This argument does not convince us. It is clear in the case before us that, were it not for the negligence of the physicians, the minor plaintiffs would not have been born and would consequently not have suffered fetal hydantoin syndrome. More particularly, the plaintiffs would not have incurred the extraordinary expenses resulting from that condition. There appears to be no reason a finder of fact could not find that the physicians' negligence was a proximate cause of the plaintiffs' injuries.

For these reasons, we hold that a claim for wrongful life may be maintained in this state. We therefore answer the District Court's questions 3 and 4 as follows:

Elizabeth and Christine Harbeson may maintain a wrongful life action. We have held that the physicians' duty to inform the parents of the risks associated with Dilantin extends to the unconceived children. The District Court held that this standard was breached by the Madigan physicians in failing to conduct a literature search. The minor plaintiffs suffer an actionable injury to the extent that they require special medical treatment and training beyond that required by children not afflicted with fetal hydantoin syndrome. They may recover damages to the extent of the cost of such treatment and training. The standard appropriate to the conduct of the physicians is the standard of the "average practitioner." RCW 4.24.290 does not apply to the Harbesons' claim.

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, UTTER, DOLLIVER, WILLIAMS, DORE, and DIMMICK, JJ., concur.