IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| NADJA IBRAHIM, an incapacitated single person, through her guardian, Regina Ibrahim, <br><br> Appellant, <br><br> v. <br><br> WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, WASHINGTON STATE CARE AUTHORITY, WESTERN STATE HOSPITAL, HARBORVIEW MEDICAL CENTER OF THE UNIVERSITY OF WASHINGTON, and BROOKHAVEN HOSPITAL, INC., an Oklahoma Corporation, <br><br> Respondents. | No. 84695-7-I <br><br> DIVISION ONE <br><br> UNPUBLISHED OPINION |

DíAZ, J. — Regina Ibrahim, as legal guardian of her daughter, Nadja Ibrahim,[1] appeals the trial court's order granting summary judgment in favor of the Department of Social and Health Services (DSHS) and the Washington State Health Care Authority (HCA) (together, the "Medicaid defendants"), which she

---

[1] At times, like the parties, we will refer to the Ibrahims by their first names for purposes of clarity; no disrespect is intended. When we use the term "Ibrahim," we normally are referring to the appellant as the party to this appeal.

claims were negligent in authorizing, reimbursing, and overseeing Nadja's treatment in an out-of-state neurological rehabilitation center. Ibrahim further contends that the trial court erred in granting summary judgment as to Ibrahim's separate claims of professional negligence and medical battery against Western State Hospital (WSH). Finding no error, we affirm.

## I.   BACKGROUND

A.   Factual background

In 2012, Nadja began experiencing hallucinations and was diagnosed with schizophrenia. Regina, Nadja's mother, acted as her caregiver and became Nadja's legal guardian in 2016, when Nadja turned 18. Several doctors prescribed medication to treat Nadja's symptoms. At all relevant times, Nadja received health care through Washington's Medicaid program.[2]

On November 4, 2014, Nadja was hospitalized after she fell and hit her head at a concert. Upon scanning her brain, the doctors found a tumor in Nadja's brain called a pineal cyst. Regina testified Nadja's discharge papers recommended she discontinue her psychiatric medication and, according to Regina, "found her not to

---

[2] "Medicaid is a cooperative federal-state program to help people of limited financial means obtain health care. Under the program, the federal government provides funds to the states, which the states then use (along with state funds) to provide the care." Planned Parenthood Arizona Inc. v. Betlach, 727 F.3d 960, 963 (9th Cir. 2013). "Each state designs, implements, and manages its own Medicaid program, with discretion as to "the proper mix of amount, scope, and duration limitations on coverage." Id. (quoting Alexander v. Choate, 469 U.S. 287, 303, 105 S. Ct. 712, 83 L. Ed. 2d 661 (1985)). "The [HCA] is the state agency responsible for administering Medicaid programs. HCA delegates authority to DSHS to administer certain Medicaid programs." Turner v. Wash. State Dep't of Soc. & Health Servs., 198 Wn.2d 273, 276 n. 3., 493 P.3d 117 (2021). Relevantly, HCA delegates authority to DSHS to administer Medicaid programs for disabled clients. See, e.g., RCW 74.09.520; RCW 74.09.530(1)(d); RCW 41.05.02 I (l)(m)(iii).

be schizophrenic."

A few weeks later, after another scan, Nadja required surgery to remove the tumor, because it had significantly increased in size. Shortly after, she required a second surgery to remove built-up fluid from the surgery site and to treat an infection.

As told by Regina, Nadja's behavior changed significantly after her surgeries. After numerous consultations, in 2016, Regina claims a doctor at a private hospital (PeaceHealth) concluded that Nadja's original schizophrenia diagnosis was incorrect, and her aberrant symptoms were the result of a traumatic brain injury (TBI). Regina thereafter sought TBI treatment for Nadja, and learned of the Neurological Rehabilitation Institute at Brookhaven Hospital (Brookhaven) in Tulsa, Oklahoma. Brookhaven had a contract with the HCA, where Brookhaven would treat patients whose level of care exceeded current resources in Washington and whose costs would be reimbursed through Medicaid.[3]

In March 2016, Nadja was admitted to Brookhaven. However, within months, Regina became concerned about the quality of Brookhaven's care. In particular, Regina suspected that Brookhaven did not adequately treat Nadja's (alleged) TBI, and prescribed her unnecessary dental care. Regina reported her concerns to her contact at HCA and asked they investigate.

By early 2018, at Regina's request, Nadja was transferred out of

---

[3] Brookhaven's contract with HCA also specified that neither Brookhaven nor "its directors, officers, partners, employees and agents" were "employees or agents of HCA." The contract further included no information about the type of care Brookhaven would provide, and made no assertions about the quality of the care any Medicaid patient would receive.

Brookhaven and back to Washington. Regina obtained guardianship of Nadja and, following her involuntary commitment to Harborview Medical Center, she was then sent to WSH. Regina believed that the placement at WSH was to determine whether Nadja had a TBI. However, according to Regina, WSH did not perform an adequate diagnostic exam, and instead the staff merely medicated Nadja with severe chemical restraint.[4]

Regina petitioned for Nadja's release from WSH, which discharged her to Regina's care.

B.      Procedural Background

Regina, as Nadja's legal guardian, sued DSHS, the HCA, and WSH, among others, on a variety of, as she admits, "novel" legal theories. The only claims at issue in this appeal are Ibrahim's claims of negligence against DSHS and the HCA, and her claims of medical battery and professional negligence against WSH, who held her under the involuntary treatment act (ITA).

The Medicaid defendants and WSH moved for summary judgment. As to the claims against the Medicaid defendants, at the hearing, Ibrahim argued the court should find that the state had "a[n] ordinary common law duty . . . to act in such a way as to have a reasonable system or a reasonable process and procedure to just provide even general observation and management of these patients" i.e., Washington residents placed at Brookhaven. In short, Ibrahim

_____

[4] There is some dispute in the record about whether WSH performed a diagnostic exam on Nadja at WSH because staff notes also mentioned that a neuropsychological evaluation was not administered because Regina wished to remove Nadja from WSH. We need not resolve this dispute for the reasons provided below.

argued that the Medicaid defendants owed her a duty "to make sure that there is a system in place that can be followed." And that a "basic duty of monitoring" benefits the individual and the state. Ibrahim admitted this theory was a "novel issue of law." The trial court granted the Medicaid defendants' and WSH's motion because it found they did not owe Ibrahim a duty of care. Ibrahim timely appeals.

## II.    ANALYSIS

To survive summary judgment against her negligence causes of action against the Medicaid defendants, Ibrahim must establish a genuine issue of material fact for each essential element of that claim, namely, (1) the existence of a duty owed to Nadja, (2) a defendant's breach of that duty, (3) a resulting injury to Nadja, and (4) proximate cause between the breach and claimed injury. Hartley v. State, 103 Wn.2d 768, 777, 698 P.2d 77 (1985).

"We may affirm a trial court's disposition of a motion for summary judgment or judgment as a matter of law on any ground supported by the record." Washburn v. City of Fed. Way, 178 Wn.2d 732, 753 n.9, 310 P.3d 1275 (2013).

Assuming but not reaching whether the Medicaid defendants owed and breached any duty of care following Nadja's placement at Brookhaven, we conclude that the trial court did not err by granting summary judgment to the Medicaid defendants because Ibrahim fails to establish a genuine issue of material fact as to whether the Medicaid defendants' actions proximately caused Nadja's harm.

Likewise, we affirm summary judgment in favor of WSH because Ibrahim fails to establish what standard of care WSH allegedly violated, how it grossly

5

deviated from that standard, and which actions by WSH constituted "intentionally" offensive conduct.

A.     Claims against the Medicaid Defendants

"Washington law recognizes two elements to proximate cause: Cause in fact and legal causation." Hartley, 103 Wn.2d at 777. "Standard proximate cause principles require the plaintiff to prove the defendant's breach of duty 'was a cause in fact of the injury' and 'as a matter of law liability should attach.'" Estate of Dormaier ex rel. Dormaier v. Columbia Basin Anesthesia, P.L.L.C., 177 Wn. App. 828, 862, 313 P.3d 431 (2013) (quoting Harbeson v. Parke-Davis, Inc., 98 Wn. 2d 460, 475-76, 656 P.2d 483 (1983)). "Cause in fact refers to the 'but for' consequences of an act—the physical connection between an act and an injury." Hartley, 103 Wn.2d at 778. A defendant's acts are the but-for cause only if such acts, "unbroken by any new independent cause[,] produces the injury complained of." Schooley v. Pinch's Deli Market, 134 Wn.2d 468, 482, 951 P.2d 749 (1998).

Ibrahim argues that "but for" the Medicaid defendants' failure to establish a policy or "minimum oversight" of Nadja's placement, she would not have had such a prolonged stay at Brookhaven. Ibrahim further avers that the State proximately caused harm to Nadja by increasing the length of her stay due to "lack of a process for discharge planning" when it was clear (to Regina) she was receiving inadequate care.

At oral argument, Ibrahim clarified that the harm was not the extended length of stay itself, but that the harm Nadja suffered was (a) the "loss of consortium," i.e., the time in which Nadja was away from her mother's "care and

affection from her family members"; and (b) the inability to seek care at other facilities, which represented (c) time lost to receive adequate care. Nadja Ibrahim v. Washington State Department of Social and Health Services (DSHS) et al., No. 84695-7-I (September 26, 2023), at 18 min., 24 sec., through 20 min., 13 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023091216/?eventID=2023091216.

In short, Ibrahim claims that "Nadja cannot get back the years she spent isolated from her family and loved ones in Oklahoma. Her physical injuries were also contributed to during this time."

This "novel" theory fails for several reasons. First, Ibrahim offers no evidence for a "physical connection" between the act or omission (the lack of oversight or discharge policies), on the one hand, and the alleged injuries (the loss of consortium, etc.), on the other, i.e., the 'but for' prong of proximate cause. Hartley, 103 Wn.2d at 778. Rather, Ibrahim simply baldly asserts in her reply brief, without any citation to the record, that Nadja would not have been placed at Brookhaven for longer than necessary but for the lack of policies and oversight. The court is not required to search the record to locate the portions supportive of a litigant's arguments. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 819, 828 P.2d 549 (1992).

In other words, even if we assume the Medicaid defendants had no oversight or policy for discharge—and that they had a duty to create and effectuate such policies, Ibrahim does not cite to anything in the record as to how those

7

omissions (1) "physically" increased her time at Brookhaven or (2) actually deprived her of consortium with her family or additional opportunities to be seen by other providers, let alone (3) "in fact" exacerbated her physical or neurological symptoms. Hartley, 103 Wn.2d at 778.

More specifically, there is no evidence in the record about what the content of those policies would have been, or how those hypothetical policies would have assured that she would have been discharged sooner, spent more time with her family, and most importantly improved the ultimate outcome of her treatment or restored her to her pre-hospitalization condition.[5] We see nothing in the record making any of these "but for" connections and (as to the medical claims) see no evidence supported by adequate medical testimony. Fabrique v. Choice Hotels Int'l, Inc., 144 Wn. App. 675, 687, 183 P.3d 1118 (2008).

Second, as to legal causation, Ibrahim provides no authority in support of the proposition that the failure of Medicaid-related defendants to provide oversight over, and generate policies regarding, third-party providers may be actionable conduct. As Ibrahim acknowledges, the "legal cause" prong of proximate causation presents a "more nuanced inquiry" and it "rests on policy considerations

---

[5] At oral argument, Ibrahim also claimed she was entitled to "return to a standard [of care] that was better than what she obtained." Nadja Ibrahim v. Washington State Department of Social and Health Services (DSHS) et al., No. 84695-7-I (September 26, 2023), at 19 min., 31 sec., through 20 min., 6 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023091216/?eventID=2023091216. Without resolving whether there is distinction in those outcomes, we note that "the benefit provided through Medicaid is a particular package of health care services . . . [with] the general aim of assuring that individuals will receive necessary medical care, but the benefit provided remains the individual services offered—not '*adequate* health care.'" Alexander, 469 U.S. at 303 (emphasis added).

as to how far the consequences of [a] defendant's acts should extend. It involves a determination of whether liability should attach as a matter of law given the existence of cause in fact." Where a party fails to provide citation to support a legal argument, we assume counsel, like the court, has found none. State v. Loos, 14 Wn. App. 2d 748, 758, 473 P.3d 1229 (2020). On this record, we are not inclined to create such precedent.

Thus, we conclude summary judgment was proper because Ibrahim does not establish a genuine issue of material facts that the Medicaid defendants proximately harmed Nadja.

B. Claims against WSH

Again, Ibrahim brings claims of professional negligence and medical battery against WSH, who received her into its care involuntarily under the ITA.

"The [ITA] is primarily concerned with the procedures for involuntary mental health treatment of individuals who are at risk of harming themselves or others, or who are gravely disabled." Poletti v. Overlake Hosp. Med. Ctr., 175 Wn. App. 828, 832, 303 P.3d 1079 (2013); RCW 71.05.010(a).

Individuals detained under ITA cannot hold their health care provider liable for professional negligence in the same way they could in an ordinary medical setting:

> No officer of a public or private agency, nor the superintendent, professional person in charge, his or her professional designee, or attending staff of any such agency . . . designated crisis responder, nor the state . . . shall be civilly or criminally liable for performing duties pursuant to this chapter with regard to the decision of whether to admit, discharge, release, administer antipsychotic medications, or detain a person for evaluation and treatment: PROVIDED, That such duties were performed *in good faith and without gross*

*negligence.*

RCW 71.05.120(1) (emphasis added).

Gross negligence is "negligence substantially and appreciably greater than ordinary negligence. Its correlative, failure to exercise slight care means . . . care substantially or appreciably less than the quantum of care inhering in ordinary negligence." Nist v. Tudor, 67 Wn.2d 332, 331, 407 P.2d 798 (1965). "[T]here can be no issue of gross negligence unless there is substantial evidence of serious negligence." Id. at 332. By limiting liability under the ITA to gross negligence, "[i]t is clear the legislature intended to provide limited immunity for a range of decisions that a hospital can make when a patient arrives, whether voluntarily or involuntarily, for evaluation and treatment." Poletti, 175 Wn. App. at 835.

Additionally, to show professional negligence, "plaintiffs . . . must prove . . . that [a provider's] failure was a proximate cause of the plaintiff's injuries." Behr v. Anderson, 18 Wn. App. 2d 341, 363, 491 P.3d 189 (2021). And "[e]xpert testimony is generally necessary to establish the standard of care and proximate cause." Id. at 363.

As to battery, which "is an intentional tort; the tortfeasor must intend an offensive touching, and the plaintiff must show there was no consent to the touching." Bundrick v. Stewart, 128 Wn. App. 11, 18, 114 P.3d 1204 (2005).

"The court reviews issues of statutory interpretation and orders granting summary judgment de novo." Poletti, 175 Wn. App. at 832. "Summary judgment is appropriate where there is no genuine issue as to any material fact, so that the moving party is entitled to judgment as a matter of law. We view the facts in a light

most favorable to the nonmoving party." Turner v. Washington State Dep't of Soc. & Health Servs., 198 Wn.2d 273, 284, 493 P.3d 117 (2021).

1. Professional negligence

Ibrahim relies upon the declaration of Dr. John Hixson, which states that "there was a lack of an organized or cohesive strategy [at WSH] for determining the best therapeutic approach for Ms. Ibrahim." However, the declaration does not first establish what the standard of care in that setting should be. Dr. Hixson opines only that "additional tests that could have and should be pursued to rule out other medical conditions that could be contributing to or causing her ongoing signs and symptoms." There is no explanation of why Dr. Hixson opines WSH "should have" conducted additional testing. Nowhere does he assert that it is the standard of care in that medical setting to do such testing.

Furthermore, nowhere does Dr. Hixson provide the evidentiary basis for creating a genuine issue of material fact that WSH in bad faith committed gross negligence, i.e., care substantially or appreciably less than the quantum of care inhering in ordinary negligence. Nist, 67 Wn.2d at 332.

2. Medical battery

Ibrahim contends that WSH's use of "ineffective medications" administered on Nadja "against the will of [her] guardian," Regina, constituted medical battery. She again offers nothing more than Regina's perceptions of Nadja's medical history and Dr. Hixson's declaration.

Nowhere does Ibrahim identify which of WSH's treatment choices were "intentional" offensive and unwanted touching. Indeed, Ibrahim claims that WSH's

interventions only "did not appear effective." Again, battery is an intentional tort and a plaintiff must come forward with some facts, which at a minimum create a genuine issue of material fact, that the defendant "intend[ed] an offensive touching." <u>Bundrick</u>, 128 Wn. App. at 18. Ibrahim made no such showing and summary judgment was proper on this claim.

III.    <u>CONCLUSION</u>

We affirm.

Díaz, J.

WE CONCUR: