George J. DALY, Jr., Plaintiff–Appellee,

v.

UNITED STATES of America, Defendant–Appellant.

No. 90–35880.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 31, 1991.

Decided Oct. 22, 1991.

William D. Symmes, Witherspoon, Kelley, Davenport & Toole, Spokane, Wash., for plaintiff-appellee.

Before WRIGHT, BEEZER and WIGGINS, Circuit Judges.

EUGENE A. WRIGHT, Senior Circuit Judge:

■ This case turns on a single issue: Does an examining physician have a duty under Washington law to inform those examined of abnormal test results, absent a doctor-patient relationship? We find that such a duty exists. We affirm the district court's holding on liability but remand for a recalculation of damages.

## BACKGROUND

George Daly suffers from sarcoidosis, an incurable lung disease. The disease can be fatal, but once it is diagnosed, prompt treatment may halt its progress. The damage already suffered is irreversible. Daly did not receive an accurate diagnosis until the disease had reached an advanced stage. The disease has left him permanently disabled.

In April 1979, as part of a preemployment physical examination for the Veteran's Administration (VA) hospital, Daly, a registered nurse, submitted to a chest x-ray and tuberculosis test. The radiologist's review of the x-ray revealed an abnormality. The doctor diagnosed tuberculosis even though the tuberculosis test was negative. Relying on expert testimony, the district court found that the radiologist should have included sarcoidosis as a possible cause of the abnormality once tuberculosis had been eliminated. The radiologist neither diagnosed sarcoidosis nor informed Daly of the abnormal finding.

From 1979 to 1981, while he was a hospital employee, Daly visited the VA employee health unit several times, seeking treatment for lung-related disorders. Although the health unit treated his symptoms, it did

Thomas O. Rice, Asst. U.S. Atty., Spokane, Wash., for defendant-appellant.

not order further chest x-rays until Daly's scheduled employee exam in January 1981. The VA radiologist noted the abnormality on the new x-ray, yet once again failed to diagnose sarcoidosis or to inform Daly of the abnormality.

Later that month, Daly consulted a private physician, Dr. Byrd. Dr. Byrd did not order a chest x-ray and did not diagnose sarcoidosis. In August 1981, Daly returned to the VA employee health unit. It ordered additional x-rays. Upon review of them, the VA recommended that Daly return to Dr. Byrd. Daly did so and Dr. Byrd continued to prescribe treatment. Not until May 1983, did Daly's physician refer him to a pulmonary specialist. The specialist diagnosed sarcoidosis and promptly started treatment. The treatment has halted the course of the disease.

Daly sued the VA for malpractice, alleging a cause of action under the Federal Tort Claims Act. The district court awarded judgment of $499,372, after finding that: (1) the VA had a duty to inform Daly of the abnormal finding in the 1979 x-ray once the tuberculosis test results became available; (2) the breach of that duty allowed the disease to progress, causing Daly's disability; and (3) the VA was liable for all resulting damage, irrespective of any intervening negligence on the part of Daly's private physician.

The VA appeals.

# I

■ Under the Federal Torts Claims Act, the law of the state where the alleged tort occurred controls issues of liability. 28 U.S.C. § 2674 (1988); *Harbeson v. Parke Davis, Inc.*, 746 F.2d 517, 521 (9th Cir.1984). This court reviews de novo the district court's interpretations of state law and applies the clearly erroneous standard to findings of fact. *Harbeson*, 746 F.2d at 521.

■ Determining the proper standard of care is a legal question reviewed de novo. *Miller v. United States*, 587 F.2d 991, 994–

95 (9th Cir.1978). We review a determination of negligence for clear error. *Id.*

# II

■ Under common law, medical malpractice liability arose only in the context of a physician-patient relationship. *E.g. Rist v. General Elec. Co.*, 47 Wash.2d 680, 289 P.2d 338 (1955). Washington relaxed this requirement when the legislature passed a comprehensive medical malpractice act in 1976. *See* Laws of 1975–76, 2nd Ex.Sess., ch. 56, §§ 6–13 (codified as amended at Wash.Rev.Code §§ 7.70.010–.080 (1989)). The statute defines three separate causes of action, based on: (1) failure to follow the accepted standard of care; (2) failure to obtain informed consent; and (3) a promise that the injury would not occur. Wash.Rev.Code § 7.70.030. For the latter two causes of action, the statute specifies that the injured person must be a patient. Wash.Rev.Code §§ 7.70.030(2), (3). For cases arising under the first cause of action, the general negligence provision, the statute contains no such requirement. Wash.Rev.Code § 7.70.030(1).

The statute also defines the necessary elements of proof for general negligence and informed consent cases. Wash.Rev. Code §§ 7.70.040–.050. These provisions, consistent with the provision defining the three causes of action, recognize that the plaintiff need not be a patient for general negligence claims. Only the section describing the informed consent elements includes a requirement that the plaintiff must have been a patient.

The statute's broad definition of potential defendants provides further evidence of the legislature's intent to impose liability beyond the context of a physician-patient relationship. The statute specifies that any "health care provider" may be held liable for failing to follow the accepted standard of care. Wash.Rev.Code § 7.70.030(1). It defines "health care providers" to include, among others, opticians, pharmacists, midwives, paramedics, and osteopathic physician's assistants. Wash.Rev.Code § 7.70.-020. None of these providers can form a physician-patient relationship, yet all may be held liable under the statute.

Recent Washington case law recognizes this potential liability. In *McKee v. American Home Products, Corp.*, 113 Wash.2d 701, 782 P.2d 1045 (1989), the Washington Supreme Court discussed a pharmacist's duties under the statute. A majority of the court rejected the argument that pharmacists have a generalized duty to warn customers of the hazardous side effects associated with a drug. *Id.* at 707–14, 782 P.2d at 1048–55. Yet both the majority and the dissent agreed that a duty to warn could arise in cases involving known or obvious errors in the prescription. *Id.* at 715, 734, 782 P.2d at 1052–53.

The court explained: "We agree pharmacists should have a duty to be alert for patent errors in a prescription, for example: obvious lethal dosages, inadequacies in the instructions, known contraindications, or incompatible prescriptions, and to take corrective measures." *Id.* at 715, 782 P.2d at 1053 (footnotes omitted, emphasis deleted). The court recognized this duty despite the absence of a physician-patient relationship between the pharmacist and the plaintiff.

Washington's recognition of a cause of action for wrongful life also demonstrates its willingness to impose liability without first finding a physician-patient relationship. In *Harbeson v. Parke–Davis, Inc.*, 98 Wash.2d 460, 656 P.2d 483 (1983), the court held that a physician owes a duty not only to potential parents, but also to "persons not yet conceived at the time of a negligent act or omission." *Id.* at 480, 656 P.2d at 490. In extending a duty beyond the physician-patient relationship, the court stressed foreseeability as the key to its analysis. *Id.* at 480, 656 P.2d at 490.

Considering the plain language of the statute, together with the demonstrated willingness of Washington courts to find liability without first finding a physician-patient relationship, we have little trouble holding that the VA radiologist owed Daly a duty. To hold otherwise would require us to assume that Washington courts would carve an exception to the general negligence rule for preemployment physicals.[1] Guided by the analysis in *Harbeson*, we rely on principles of foreseeability. We find that a person is foreseeably endangered when examining physicians fail to make known abnormal findings.[2]

The precise scope of this duty is unclear. The statutory scheme, together with cases such as *McKee*, suggest that the scope of the duty depends on the nature of the underlying relationship. For example, in *McKee* the duty extended only to the factors uniquely within the control of the pharmacist. The court recognized that the highest standard was appropriately applied to the physician-patient relationship. *McKee*, 113 Wash.2d at 710, 782 P.2d at 1050.

In the setting of a preemployment examination, where the physician-patient relationship does not yet exist, the physician's duty should be less extensive. We need not determine the exact contours of this duty, however. We find persuasive, as did Judge McNichols, the expert testimony given at trial that, at a minimum, the radiologist should have notified Daly of the abnormality.

This duty is hardly burdensome and recognizes that those who place themselves "in the hands of a person held out to the world as skilled in a medical profession, albeit at the request of one's employer, ...

---

1. It would also require us to assume that Washington would create an exception to the assumption of duty rule. Washington follows the general rule, set forth in the Restatement (Second) of Torts § 323 (1965), that liability may arise when one gratuitously assumes an obligation. The defendant is held liable for any negligence if it was reasonably foreseeable that others would rely on the assumption of the obligation. *Doyle v. Planned Parenthood of Seattle–King County, Inc.*, 31 Wash.App. 126, 639 P.2d 240 (1982).

2. Most courts that have considered this question have reached similar results. *See, e.g., Green v. Walker*, 910 F.2d 291 (5th Cir.1990) (interpreting Louisiana law); *Betesh v. United States*, 400 F.Supp. 238 (1974) (interpreting Maryland law); *Meinze v. Holmes*, 40 Ohio App.3d 143, 532 N.E.2d 170 (1987); *LoDico v. Caputi*, 129 A.D.2d 361, 517 N.Y.S.2d 640 (1987); *Beadling v. Sirotta*, 41 N.J. 555, 197 A.2d 857 (1964). *But see Beaman v. Helton*, 573 So.2d 776 (Miss.1990).

justifiably [have] the reasonable expectation that the expert will warn of any incidental dangers of which he is cognizant due to his peculiar knowledge of his specialization." *Green v. Walker,* 910 F.2d 291, 295–96 (5th Cir.1990) (internal quotation and citation omitted).

We find unpersuasive the VA's argument that we must analyze this case under the theory of informed consent. It asserts correctly that Washington courts have maintained the requirement of a physician-patient relationship in informed consent cases. *E.g. Crawford v. Wojnas,* 51 Wash. App. 781, 754 P.2d 1302, *rev. denied,* 111 Wash.2d 1027 (1988) (duty to obtain informed consent does not extend to mother, who contracted polio from an inoculation given to the patient, her daughter).

Washington recognizes, however, that informed consent and general negligence provide alternative theories of liability. The possible applicability of informed consent theory does not preclude applying a general negligence theory. *Burnet v. Spokane Ambulance,* 54 Wash.App. 162, 169, 772 P.2d 1027, 1030, *rev. denied, Burnet v. Sacred Heart Medical Center,* 113 Wash.2d 1005, 777 P.2d 1050 (1989); Wash.Pattern Jury Instructions 105.06, *reprinted in* 6 Wash.Practice 521–22 (3d ed. 1989).

Some informed consent cases may not be brought under a general negligence theory. For example, the informed consent theory may allow recovery for high risk treatment rendered in a nonnegligent manner, if the treatment is administered without first obtaining informed consent. *Burnet,* 54 Wash.App. at 169, 772 P.2d at 1030. Daly does not present such a case: his complaint rests on allegations that the radiologist did not meet the accepted standard of care when he failed to notify Daly of the abnormal finding.

We agree with the district court that the VA had a duty to inform Daly of the abnormality detected in the x-ray, and that the failure to do so was a breach of that duty.

### III

■ Washington follows the general rule, set forth in section 457 of Restatement (Second) of Torts, that negligent or harmful subsequent treatment falls within the scope of the risk of the original negligent treatment. *Lindquist v. Dengel,* 92 Wash.2d 257, 595 P.2d 934 (1979). Applying this rule, the district court found the VA liable for the damage Daly suffered as the disease progressed from 1979 to 1983. The court reasoned that by failing to inform Daly of the abnormality, the VA radiologist prevented Daly from halting the progress of the disease at an early stage. The court held the VA liable not only for its own negligence, but also for any negligence on the part of Dr. Byrd, Daly's personal physician. We disagree with that analysis. Under Washington law, the VA may be held liable only for its own negligence.

In cases of successive malpractice, section 457 applies only when the subsequent treatment is undertaken to mitigate harm inflicted by a prior physician. The Restatement provides:

> Additional Harm Resulting From Efforts to Mitigate Harm Caused by Negligence[:] If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner.

Restatement (Second) of Torts § 457 (1965). The relationship between the harm inflicted by the first physician and the treatment initiated by the second is crucial to holding the first physician liable for subsequent malpractice.

The Washington Supreme Court focused on this relationship when it applied the rule in *Lindquist.* It explained that a physician could not "avoid liability for the harm caused by treatment from other physicians if his own negligence was the cause of the injury which necessitated that treatment." *Id.* at 263, 595 P.2d at 937. The court had no difficulty linking the first physician's

malpractice with that of the second. The first physician's negligence resulted in an identifiable harm; the second's course of treatment was designed to mitigate that harm. Under section 457, the first physician could be held liable for the malpractice of the second.

The court also recognized, however, that not every instance of successive malpractice falls within the scope of section 457. *Id.* The court noted that "physicians acting independently of one another are liable only for their own wrong." *Id.* In other words, the rule applies only when the second physician's treatment is directed toward mitigating the harm inflicted by the first.

*Harrington v. Cohen,* 6 Mass.App. 205, 374 N.E.2d 344 (1978) illustrates the point. Massachusetts, like Washington, analyzes instances of successive malpractice under section 457. The first physician in *Harrington* undertook treatment of a child suffering from scoliosis. The physician's negligence caused complications; they forced the physician to terminate the treatment before it was complete. As a result, the treatment failed entirely. The patient engaged a second surgeon to perform the same procedure. Like the first physician, the second one performed the procedure negligently. The second surgeon's negligence caused a brain abscess. 374 N.E.2d at 345.

The court refused to hold the first physician liable for the second's malpractice. It reasoned that the second treatment was not aimed at mitigating harm inflicted by the prior treatment. Rather, both physicians had undertaken independent treatment of the same problem. The court acknowledged that had the first treatment been successful, the second would not have been necessary. But the court recognized that this type of cause and effect relationship was not sufficient to meet the test of section 457. Unless the second physician treats harm inflicted by the first, section 457 liability does not arise. 374 N.E.2d at 346.

Daly's situation parallels that of the plaintiff in *Harrington.* Daly, like Harrington, sought treatment from a second physician for an underlying ailment rather than for any harm inflicted by earlier treatment. In Daly's case, the first physician's treatment did cause harm. He suffered irreversible lung damage as the disease progressed from 1979 to 1981. But the treatment he sought from the second physician, his personal physician, was not treatment directed toward mitigating that harm. Daly's situation stands in sharp contrast to *Lindquist,* where the second treating physician was attempting to mitigate the harm inflicted by the first.

Consistent with section 457, we hold that the VA may not be held liable for any negligent treatment Daly received from Dr. Byrd. On remand, the district court must determine whether Dr. Byrd met the accepted standard of care when he failed to provide a correct diagnosis. If the court finds Daly's personal physician acted negligently, it must apportion liability, holding the VA responsible only for the damage suffered prior to Dr. Byrd's negligence.

## IV

■ This court reviews for clear error an award of damages under the Federal Tort Claims Act. *Shaw v. United States,* 741 F.2d 1202, 1205 (9th Cir.1984). The court awarded Daly $499,372, which included $69,988 for past lost wages and $277,297 for loss of future wages.

The VA assails the lost earnings awards. It contends that the court improperly found Daly 100% disabled, despite evidence that his disability was not total. It also argues that the court improperly awarded him 100% of his economic losses, despite evidence of his failure to mitigate damages and of a continuing earning capacity.

We reject the VA's challenge regarding the extent of Daly's disability. After receiving a variety of evidence on this subject, the district court acted within its discretion when it chose to credit the testimony of Drs. Keller, a psychiatrist, and Whitehouse, a physician. Although the defendant may disagree with the credibility

assessment, the district court did not commit clear error.

■ Nor did the court commit clear error when it found that Daly's 85% disability entitled him to 100% of his economic losses. He presented economic evidence that his past wage loss was $69,988. The court credited testimony that in June 1988, he was barely able to function at his job. It then awarded him 100% of his past lost wages. In computing future lost earnings, Daly's economist, Dr. Barnes, assumed that Daly would not be employed in the future. The district court found the minimum level of disability was 85% but awarded 100% of the Barnes estimate. The court accepted the common sense view that Daly's inability to pursue an occupation as a result of having suffered at least an 85% permanent body disability justified awarding him 100% of his future lost wages.

## V

We affirm the district court's conclusion that the VA had a duty to inform Daly of the abnormality in his x-ray. We reverse its holding that the VA is liable for all damage Daly suffered from 1979 to 1983. On remand, the district court must determine whether Daly's private physician was negligent. If it finds Daly's physician negligent, then the award against the VA must be reduced appropriately.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

The parties will bear their own costs on this appeal.