**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
AUGUST 18, 2022

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
AUGUST 18, 2022

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT | ) ) ) ) | No. 100526-1 |
| IN | ) | En Banc |
|  | ) |  |
| YESENIA PACHECO; LUIS LEMUS; S.L.P., minor child, by and through her Guardian ad Litem, Brian Comfort, | ) ) ) ) | Filed: <u>August 18, 2022</u> |
|  | ) |  |
| Plaintiffs-Appellees, | ) ) |  |
| v. | ) ) |  |
| UNITED STATES OF AMERICA, | ) ) |  |
| Defendant-Appellant. | ) ) ) |  |

YU, J. — This case asks whether a patient who received negligent reproductive health care may recover all damages proximately caused by the provider's negligence, regardless of the patient's reason for seeking care. The answer is yes.

*Pacheco, et al. v. United States*, No. 100526-1

If any Washington health care provider breaches their duty "to follow the accepted standard of care," then damages proximately caused by the provider's negligence may be recovered upon the necessary factual findings. RCW 7.70.030(1). The same is true for providers of reproductive health care.[1] As a result, where negligent contraceptive care results in the birth of a child, and that child has a congenital defect,[2] the provider may be liable for damages relating to the child's condition. Such liability does not require proof that the child was at a known, heightened risk for developing congenital defects or that the patient sought contraception for the specific purpose of preventing the birth of a child with congenital defects. Thus, we answer the certified question in the affirmative.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Yesenia Pacheco sought contraception from Neighborcare Health, a federally funded community health center, "to prevent the birth of an unwanted child." Clerk's Papers (CP) at 101. The method Pacheco and her care providers selected was Depo-Provera, "a highly effective" injectable contraceptive medication that "must be administered on a timely basis every eleven to thirteen

---

[1] For purposes of this opinion, we use the phrase "reproductive health care" to include (1) contraception (such as medication and sterilization procedures), (2) preconception care (such as genetic counseling and advice on medications that may be taken during an anticipated pregnancy), (3) abortion, and (4) prenatal care. *Cf.* RCW 48.43.072(8)(c).

[2] For purposes of this opinion, we use "congenital defect" and "birth defect" interchangeably to mean "a physical or biochemical defect that is present at birth and may be inherited or environmentally induced." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/birth%20defect [https://perma.cc/FJ78-NHRM].

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

weeks." *Id.* at 71-72. Pacheco received regular Depo-Provera injections at Neighborcare from December 2009 until July 2011.

On September 30, 2011, Pacheco went to an appointment at Neighborcare to receive a scheduled, timely Depo-Provera injection. A medical assistant "mistakenly injected [her] with a flu vaccine instead." *Id.* at 71. The medical assistant "failed to confirm why Ms. Pacheco was there, to document consent to the flu vaccine or a change in the orders, or to advise Ms. Pacheco of the side effects of a flu shot and/or the consequences of skipping a Depo-Provera injection." *Id.* at 72. As a result, Pacheco did not know she was given the wrong injection.

Neighborcare did not inform Pacheco of its mistake until December 2011, when she sought an appointment for her next Depo-Provera injection. At that time, Neighborcare asked Pacheco to come to the clinic for a pregnancy test, which was positive. Plaintiff S.L.P. was born to Pacheco and plaintiff Luis Lemus on August 2, 2012. Shortly after her birth, S.L.P. "developed clinical seizure activity," and she "remained hospitalized from the date of her birth, August 2, 2012 to August 12, 2012." *Id.* at 103-04.

Testing revealed that S.L.P. has perisylvian polymicrogyria (PMG), a congenital defect resulting in permanent disabilities, including "severe speech and language difficulties," "impairment in fine and gross motor skills," a "decrease in

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

self-help and adaptive abilities," "difficulties in arousal and attention," "recurrent seizures," "challenges in social reciprocity," "cognitive impairment," and "academic impairment." *Id.* at 55, 57-59, 61. S.L.P.'s "life care plan" shows that she will require "ongoing rehabilitative care," "various therapies," and "different evaluations." *Id.* at 66. The parents have no personal or family history of similar disabilities or other congenital defects, and Pacheco's two older children were born without congenital defects. S.L.P.'s PMG was determined to be "idiopathic, meaning medicine can't find a reason why" it occurred. *Id.* at 189.

In March 2017, Pacheco, Lemus, and S.L.P. filed an amended complaint against the United States pursuant to the Federal Tort Claims Act (FTCA), Pub. L. No. 79-601, 60 Stat. 812-852, in the United States District Court for the Western District of Washington, seeking damages relating to Pacheco's pregnancy and S.L.P.'s PMG. It is undisputed that "the United States is the only proper defendant, and the FTCA is the exclusive remedy available to plaintiffs." *Id.* at 93. "Under the FTCA, the law of the state where the tort allegedly occurred controls issues of liability." Order Certifying Question to Wash. Supreme Ct., *Pacheco v. United States*, No. 21-35175, at 6 (9th Cir., Jan. 3, 2022) (Order Certifying Question) (citing *Daly v. United States*, 946 F.2d 1467, 1469 (9th Cir. 1991)).

The United States filed a motion to dismiss the amended complaint, which the district court denied. The court ruled that whether the alleged damages relating

4

to S.L.P.'s PMG were recoverable depended on whether they were "reasonably foreseeable" because "'[t]he concept of foreseeability limits the scope of the duty owed.'" CP at 96 (quoting *Christen v. Lee*, 113 Wn.2d 479, 492, 780 P.2d 1307 (1989)). The court decided that the issue of foreseeability in this case must go to trial because a "reasonable fact finder could conclude that the birth of a child with a medical condition or disability is within the ambit of the harms that could reasonably be expected to arise" from the negligence alleged. *Id.*

Following bench trial on liability in January 2020, the court found that Neighborcare failed to follow the "minimum . . . standard of care in the circumstances presented" and that if Pacheco had "received a Depo-Provera injection on September 30, 2011, she would not have conceived." *Id.* at 72. The court further found "that the birth of a child with a medical condition or disability is a foreseeable result [of] the negligence that occurred here." *Id.* at 73 n.2. Based on its findings, the court concluded that that Neighborcare breached its duty of care, which "resulted in and proximately caused injury." *Id.* at 73. The court also concluded "there is no contributory or comparative negligence" by Pacheco. *Id.*

Following a bench trial on damages in September 2020, the court found that the United States was liable for (1) $42,294.81 in past special damages for Pacheco's pregnancy-related expenses, (2) $7.5 million for "SLP's future special damages for extraordinary medical, educational, and similar expenses attributable

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

to her conditions," and (3) general damages for the "'mental anguish and emotional stress'" of Pacheco ($1.5 million) and Lemus ($1 million). *Id.* at 52-53 (quoting *Harbeson v. Parke-Davis, Inc.*, 98 Wn.2d 460, 477, 656 P.2d 483 (1983)). The court thus entered an amended judgment against the United States totaling $10,042,294.81.

The United States appealed, conceding its liability for damages "associated with pregnancy and childbirth" but contending that "it was inappropriate to extend liability to the effects of the neurological disorder." *Id.* at 7. The Ninth Circuit Court of Appeals heard oral argument on December 14, 2021, and certified a question to this court on January 3, 2022. As formulated by the Ninth Circuit court, the question is:

> Under claims for wrongful birth or wrongful life, does Washington law allow extraordinary damages for costs associated with raising a child with birth defects when defendant(s) negligently provided contraceptive care even though plaintiff(s) did not seek contraceptives to prevent conceiving a child later born with birth defects?

Order Certifying Question at 3. The court did "not intend the phrasing of our question to restrict the Washington Supreme Court's consideration of the issue" and further "recognize[d] that the Washington Supreme Court may, in its discretion, reformulate the question." *Id.* at 17 (citing *Broad v. Mannesmann Anlagenbau AG*, 196 F.3d 1075, 1076 (9th Cir. 1999)).

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

We exercise our discretion to reformulate the certified question slightly to refer to claims for "negligent reproductive health care" generally, rather than "wrongful birth or wrongful life" specifically. This phrasing better aligns with the record because the plaintiffs' amended complaint does not "parse their medical negligence claim into the different categories of 'wrongful birth,' 'wrongful conception,' 'wrongful negligence,' or 'wrongful life.'" CP at 92 n.2. Moreover, as discussed below, relying on such categories to define the scope of liability for negligent reproductive health care is contrary to Washington law.

## ISSUE

Under claims for negligent reproductive health care, does Washington law allow extraordinary damages for costs associated with raising a child with birth defects when defendant(s) negligently provided contraceptive care even though plaintiff(s) did not seek contraceptives to prevent conceiving a child later born with birth defects?

## ANALYSIS

In Washington, "[e]very individual has the fundamental right to choose or refuse birth control" and "[e]very pregnant individual has the fundamental right to choose or refuse to have an abortion." RCW 9.02.100(1)-(2). In addition, our legislature has recognized that reproductive health care is "an essential part of primary care for women and teens." LAWS OF 2018, ch. 119, § 1(3). Thus, a claim

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

for damages caused by negligent reproductive health care is a type of medical malpractice claim. *McKernan v. Aasheim*, 102 Wn.2d 411, 414, 687 P.2d 850 (1984); *Harbeson*, 98 Wn.2d at 462.

"Medical malpractice claims are fundamentally negligence claims, rooted in the common law tradition." *Putman v. Wenatchee Valley Med. Ctr., P.S.*, 166 Wn.2d 974, 982, 216 P.3d 374 (2009). As a result, the elements of a medical malpractice claim "are merely particularized expressions of the four concepts fundamental to any negligence action: duty, breach, proximate cause, and damage or injury." *Harbeson*, 98 Wn.2d at 468. Washington health care providers have a duty "to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which [they] belong[ ], in the state of Washington, acting in the same or similar circumstances." RCW 7.70.040(1)(a). A medical malpractice claim may be brought against a provider who breaches this duty if "[s]uch failure was a proximate cause of the injury complained of." *Id.* at 1(b).

In this case, it is undisputed that (1) the United States had a duty to follow the accepted standard of care in providing Pacheco with contraceptive medication, (2) the United States breached its duty, (3) the breach proximately caused Pacheco's pregnancy and S.L.P.'s birth, and (4) the plaintiffs incurred damages as a result. The certified question asks what types of damages the plaintiffs may

*Pacheco, et al. v. United States*, No. 100526-1

recover as a matter of Washington law "in light of the record certified by the federal court." *Frias v. Asset Foreclosure Servs., Inc.*, 181 Wn.2d 412, 420, 334 P.3d 529 (2014). "Certified questions are matters of law we review de novo." *Id.*

The United States asserts that it cannot be liable for damages associated with S.L.P.'s PMG based on "[l]ongstanding principles of tort law." Def.-Appellant's Opening Br. at 13. However, its proposed analysis takes a unique approach to claims for negligent reproductive health care in which (1) all such claims must be categorized as either "wrongful pregnancy or conception,"[3] "wrongful birth," or "wrongful life," (2) such categorization is determined by the patient's reason for seeking care, and (3) the way a claim is categorized determines the scope of the provider's duty and potential liability. Applying this approach to the case presented, the United States contends that the "plaintiffs have made out only a wrongful pregnancy or wrongful conception cause of action" because "Pacheco sought contraception from [Neighborcare] to prevent pregnancy, and her case did not involve any heightened risk of or concern for the possibility of a birth defect." *Id.* at 22-23. Therefore, the United States argues, damages related to S.L.P.'s PMG "are untethered from the duty that was breached." *Id.* at 21.

---

[3] Consistently with the briefs and much of the relevant precedent, we use the phrases "wrongful pregnancy" and "wrongful conception" interchangeably for purposes of this opinion.

*Pacheco, et al. v. United States*, No. 100526-1

This approach is not supported by Washington precedent and is contrary to Washington public policy as expressed by our legislature. Claims for negligent reproductive health care are subject to the same principles that apply to any medical malpractice action. Application of those principles shows that the United States' liability for damages associated with S.L.P.'s PMG depends on questions of fact, not questions of law. Whether the district court's factual findings should be affirmed or reversed on appeal is beyond the scope of the certified question, and is therefore left to the Ninth Circuit Court of Appeals.

A. Overview of claims for negligent reproductive health care

To provide context for the parties' arguments, it is necessary to briefly review the history of tort claims involving negligent reproductive health care. For a long time, and in many places, reproductive health care was either nonexistent or prohibited by law. This began to change as medical and legal advances increased the efficacy and availability of such care. *See Stewart-Graves v. Vaughn*, 162 Wn.2d 115, 130-31, 170 P.3d 1151 (2007); *Harbeson*, 98 Wn.2d at 471-72. As a result, courts began seeing claims for damages where negligent reproductive health care resulted in conception. Different jurisdictions have adopted a wide variety of approaches to such claims in both terminology and substance.

*Pacheco, et al. v. United States*, No. 100526-1

> 1. There is no uniformly applicable terminology in this context, either nationally or in Washington

When first confronted with malpractice claims, reproductive health care providers often sought dismissal by contending "that pregnancy, the ensuing birth of a child, and the costs and expenses of the delivery and rearing of a child, are not legally cognizable injuries." *Custodio v. Bauer*, 251 Cal. App. 2d 303, 310, 59 Cal. Rptr. 463 (Cal. Ct. App. 1967); *see also Ball v. Mudge*, 64 Wn.2d 247, 248-49, 391 P.2d 201 (1964). However, most states ultimately recognized at least some types of medical malpractice claims for negligent reproductive health care.

In doing so, many courts adopted terminology dividing such claims into three, mutually exclusive categories:

> (1) "wrongful pregnancy" or "wrongful conception" as an action brought by the parents of a healthy, but unplanned, child against a physician who negligently performed a sterilization or abortion; (2) "wrongful birth" as a claim brought by parents of a child born with birth defects; and (3) "wrongful life" as a claim brought by the child suffering from such birth defects.

*Nanke v. Napier*, 346 N.W.2d 520, 521 (Iowa 1984). This terminology "seems to have its genesis as a play upon the statutory tort of 'wrongful death.'" *Bader v. Johnson*, 732 N.E.2d 1212, 1216 (Ind. 2000) (citing Alexander M. Capron, *Tort Liability in Genetic Counseling*, 79 COLUM. L. REV. 618, 634 n.62 (1979)). However, it is neither universally nor uniformly employed.

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pacheco, et al. v. United States*, No. 100526-1

Some jurisdictions have rejected such terminology altogether as "not instructive" because "[a]ny 'wrongfulness' lies not in the life, the birth, the conception, or the pregnancy, but in the negligence of the physician." *Viccaro v. Milunsky*, 406 Mass. 777, 779 n.3, 551 N.E.2d 8 (1990). These courts reason that assigning a particular label to a claim for negligent reproductive health care "adds nothing to the analysis, inspires confusion, and implies the court has adopted a new tort." *Bader*, 732 N.E.2d at 1216. Jurisdictions following this approach simply refer to any claim for negligent reproductive health care as "medical malpractice." *E.g.*, *id.*; *Greco v. United States*, 111 Nev. 405, 409, 893 P.2d 345 (1995); *Burke v. Rivo*, 406 Mass. 764, 765, 551 N.E.2d 1 (1990).

Moreover, among jurisdictions that do use the terminology of "wrongful pregnancy/birth/life," the definitions of these terms vary considerably. For instance, Florida does not distinguish wrongful pregnancy claims from wrongful birth claims. *Kush v. Lloyd*, 616 So. 2d 415, 417 n.2 (Fla. 1992) (per curiam). Idaho law appears to prohibit "wrongful birth" claims, but this prohibition applies only to claims based on the allegation "'that but for the act or omission of another, a person would not have been permitted to have been born alive but would have been aborted.'" *Vanvooren v. Astin*, 141 Idaho 440, 442, 111 P.3d 125 (2005) (quoting IDAHO CODE § 5-334(1)). In other circumstances, Idaho permits "medical malpractice" claims alleging that "'but for a wrongful act or omission, fertilization

12

*Pacheco, et al. v. United States*, No. 100526-1

would not have occurred,'" even though such claims might be characterized as "wrongful birth" by another jurisdiction. *Conner v. Hodges*, 157 Idaho 19, 23 n.2, 333 P.3d 130 (2014) (quoting IDAHO CODE § 5-334(2)).

In Washington, this area of law is governed by three opinions, which do not establish a uniform terminology. *McKernan*, 102 Wn.2d 411; *Harbeson*, 98 Wn.2d 460; *Ball*, 64 Wn.2d 247. In *McKernan*, we considered the scope of available damages "[w]here a healthy . . . child[4] is born after an unsuccessful sterilization operation." 102 Wn.2d at 412. Although the claim in *McKernan* would have been appropriately categorized as one for "wrongful pregnancy," we did not use that phrase, instead referring to the claim presented simply as a claim for "medical malpractice" based on the doctor's alleged "negligen[ce]." *Id.* at 414, 413; *cf. Ball*, 64 Wn.2d at 247 (considering a claim for "negligence by defendant Carl E. Mudge in failing to successfully sterilize Mr. Ball in a vasectomy").

However, we have not clearly rejected the "wrongful pregnancy/birth/life" terminology either. In *Harbeson*, a federal certified question asked whether Washington law permits children born with congenital defects and their parents to bring "'wrongful life'" and "'wrongful birth'" claims, respectively. 98 Wn.2d at

---

[4] Our precedent in this area, like the precedent of many other jurisdictions, describes children as being either "normal" or "defective." *McKernan*, 102 Wn.2d at 412-17, 419; *Harbeson*, 98 Wn.2d at 466-67, 471-73, 475-76, 478; *Ball*, 64 Wn.2d at 248, 250. We take this opportunity to disavow such terminology because it is both incorrect and harmful to refer to any person as "defective" or to suggest that a child with congenital defects is not "normal."

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

464; *see also Stewart-Graves*, 162 Wn.2d at 129-30, 133 (discussing "wrongful birth" and "wrongful life"). In holding that such claims are allowed, we noted that "[t]he epithet wrongful birth has been used to describe several fundamentally different types of action," and we discussed the difficulty of coming up with a comprehensive definition. *Harbeson*, 98 Wn.2d at 465. Therefore, although *Harbeson* used the term "wrongful birth," we explicitly did so only "[f]or the purposes of the analysis which follows." *Id.* at 467. This case-specific language was consistent with our general approach to certified questions in which "[w]e consider the legal issues not in the abstract but based on the certified record provided by the federal court." *Carlsen v. Glob. Client Sols., LLC*, 171 Wn.2d 486, 493, 256 P.3d 321 (2011).

Thus, the United States is incorrect in its assertion that this court has already established a "careful taxonomy of actions for wrongful birth, wrongful life, and wrongful conception." Def.-Appellant's Answer to Br. of Amicus Curiae at 1. To the contrary, although we have sometimes used such terms for descriptive purposes, we have not done so consistently, we have never adopted comprehensive definitions to be applied in all contexts, and we have never held that the way a claim is labeled, in itself, determines the scope of a provider's duty or liability.

14

*Pacheco, et al. v. United States*, No. 100526-1

        2.       Washington law is among the most comprehensive in the nation in recognizing claims for negligent reproductive health care

In addition to differing on terminology, jurisdictions around the country have taken different approaches to recognizing particular types of claims based on negligent reproductive health care. Washington has taken a relatively liberal approach based on ordinary tort law principles and Washington public policy.

Most states recognize claims brought by parents for wrongful pregnancy and wrongful birth (or medical malpractice actions resembling such claims). *See Lininger v. Eisenbaum*, 764 P.2d 1202, 1208 n.9 (Colo. 1988) (collecting cases). *But see Etkind v. Suarez*, 271 Ga. 352, 352-53, 519 S.E.2d 210 (1999); *Azzolino v. Dingfelder*, 315 N.C. 103, 116, 337 S.E.2d 528 (1985). However, "the overwhelming majority of courts" do not recognize claims brought by children for wrongful life, citing a multitude of reasons, ranging from tort law principles (for instance, "that a physician owes no duty to an unborn child") to more philosophical considerations (for instance, "that no child has a right not to be born"). *Lininger*, 764 P.2d at 1210 & n.10.

Nevertheless, some states recognize all types of actions based on negligent reproductive health care, without singling out wrongful life actions for exclusion. These courts have done so based on ordinary tort law principles and equitable considerations. For instance, the Supreme Court of California ruled that "although the cause of action at issue has attracted a special name—'wrongful life'—

15

plaintiff's basic contention is that [their] action is simply one form of the familiar medical or professional malpractice action." *Turpin v. Sortini*, 31 Cal. 3d 220, 229, 643 P.2d 954, 182 Cal. Rptr. 337 (1982). The Supreme Court of New Jersey agreed, reasoning that "[t]he right to recover the often crushing burden of extraordinary expenses visited by an act of medical malpractice should not depend on the 'wholly [fortuitous] circumstance of whether the parents are available to sue.'" *Procanik v. Cillo*, 97 N.J. 339, 352, 478 A.2d 755 (1984) (quoting *Turpin*, 31 Cal. 3d at 238).

We followed a similar path in *Harbeson*. In that case, a woman who was not yet pregnant asked several doctors whether her prescription medication would cause birth defects. *Harbeson*, 98 Wn.2d. at 463. The doctors negligently "failed to conduct a literature search or to consult other sources" and, as a result, inaccurately told the woman that her medication was not likely to cause significant birth defects. *Id.* at 464. She therefore took the medication as prescribed during her pregnancies, and two of her children were born with "physical and developmental defects." *Id.* at 463. The parents sued for wrongful birth and the children sued for wrongful life in federal district court, which asked this court whether Washington law recognizes such claims. We held that it does.

First, we considered wrongful birth, analyzing "the four concepts fundamental to any negligence action: duty, breach, proximate cause, and damage

or injury," and concluding that a wrongful birth action "fits within the conceptual framework of our law of negligence." *Id.* at 468, 476. Then we "consider[ed] wrongful life according to the four traditional tort concepts" and likewise held that such a claim was actionable. *Id.* at 480. In doing so, we agreed with the California Supreme Court's observation that "'it would be illogical and anomalous to permit only parents, and not the child, to recover for the cost of the child's own medical care.'" *Id.* at 479 (quoting *Turpin*, 31 Cal. 3d at 238).

Other courts have criticized our decision in *Harbeson* for allegedly "disregard[ing] the child's failure to prove an injury in light of its perception that the equities of permitting the child to recover special damages were entitled to greater weight." *Lininger*, 764 P.2d at 1212; *see also Siemieniec v. Lutheran Gen. Hosp.*, 117 Ill. 2d 230, 246-48, 512 N.E.2d 691, 111 Ill. Dec. 302 (Ill. 1987), *overruled in part on other grounds by Clark v. Child.'s Mem. Hosp.*, 2011 IL 108656, ¶ 113, 955 N.E.2d 1065, 353 Ill. Dec. 254. However, no one suggests that we should disavow *Harbeson* now, and the approach we took there shows a clear intent to apply negligence principles equitably and in accordance with Washington public policy. This approach was reinforced by *McKernan*, decided the year after *Harbeson*.

In *McKernan*, a woman became pregnant after undergoing "a sterilization operation" and "and gave birth to a healthy . . . child." 102 Wn.2d at 412. The

parents filed suit, alleging that the operation was negligently performed and seeking damages for the failed procedure, the pregnancy, and the childbirth; pain and suffering; loss of consortium; and "*the costs associated with rearing a child, college education, out of pocket expenses and services of parents, and emotional burdens*." *Id.* at 413 (quoting record). There was no question that the parents' claim was allowed; only the final category of damages was disputed. *Id.* at 421.

*McKernan* noted that "the vast majority of courts have held that no damages may be recovered for the cost of rearing and educating a healthy . . . child born as the result of medical malpractice" based on "a variety of reasons." *Id.* at 414. However, we acknowledged that a "minority line of authority permits recovery of the costs of rearing and educating a healthy . . . child," usually subject to offsetting "by the value of the benefits conferred by the parent-child relationship." *Id.* at 416. We ultimately chose to follow the majority approach based on both ordinary negligence principles and "the public policy of this state." *Id.* at 421.

As to negligence principles, we recognized "'that recovery may not be had for damages which are speculative or conjectural'" and held that "it is impossible to establish with reasonable certainty whether the birth of a particular healthy . . . child damaged its parents." *Id.* at 419-20 (quoting *Coleman v. Garrison*, 349 A.2d 8, 12 (Del. 1975), *overruled in part on other grounds by Garrison v. Med. Ctr. of Del. Inc.*, 571 A.2d 786 (1989) (court order)). In addition, from a policy

standpoint, we recognized that "the simple fact that the parents saw fit to allege their child as a 'damage' to them would carry with it the possibility of emotional harm to the child." *Id.* at 421.

We have not considered another case involving negligent reproductive health care since *McKernan*. The closest we came was a 2007 case rejecting the application of wrongful birth and wrongful life principles to the allegedly negligent resuscitation of a newborn, holding that "*Harbeson* applies when a health care provider breaches a prenatal duty to parents and children; it does not apply when the breach occurs after birth." *Stewart-Graves*, 162 Wn.2d at 133.

Thus, although Washington case law in this area is limited, it is instructive. We are one of the few states that recognize a broad range of claims by both parents and children for negligent reproductive health care. The viability of such claims, and the damages that may be recovered, is not determined by the way a claim is labeled but, instead, according to ordinary negligence law and Washington public policy in light of the particular facts presented. We apply the same approach to answer the certified question in this case.

B.    A patient's reason for seeking reproductive health care does not limit the scope of a negligent provider's liability as a matter of Washington law

The United States focuses its analysis on foreseeability, in connection with both duty and proximate causation. As to duty, the United States contends that because Pacheco did not specifically seek to prevent the birth of a child with a

19

congenital defect and was not at a heightened risk for having a child with congenital defects, damages relating to S.L.P.'s PMG "are untethered from the duty that was breached" as a matter of law. Def.-Appellant's Opening Br. at 21. In the alternative, the United States contends that such damages are "properly characterized as the result of an intervening cause, which came into active operation after any negligence by the defendant and which is too remote and untethered from the negligence at issue to give rise to proximate causation," also as a matter of law. *Id.* at 43. We disagree with both arguments.

The federal district court correctly ruled that foreseeability in this case, as related to both duty and proximate causation, is an issue of fact, not an issue of law. Moreover, limiting a provider's liability as a matter of law based on the patient's reason for seeking contraceptive care would violate Washington public policy as expressed by the legislature.

1. Foreseeability in this case is a question of fact about the scope of the United States' duty, not a question of law about whether a duty exists

Foreseeability can play a confusing role in tort law. It is not one of the four negligence elements (duty, breach, causation, and damages), but it is nevertheless relevant to both duty and causation. First considering duty, "foreseeability plays a role in both the legal and factual inquiries regarding duty and its scope." *McKown v. Simon Prop. Grp., Inc.*, 182 Wn.2d 752, 764, 344 P.3d 661 (2015). It "can be a

*Pacheco, et al. v. United States*, No. 100526-1

question of whether duty exists" as a matter of law "and also a question of whether the harm is within the scope of the duty owed" as a matter of fact. *Id.*

This distinction can be a bit unclear in the abstract, but it is well illustrated by *McKown*, where the issue was whether a mall's owner could be liable for a mass shooting that occurred there. In that case, foreseeability was a question of law going to whether a duty existed because a landowner's "duty to protect business invitees from third party criminal conduct" arises only "when such conduct is foreseeable based on past experience of prior similar acts."[5] *Id.* at 757. By contrast, where the existence of a duty has been established as a matter of law, foreseeability becomes a factual determination as to "whether the kind of harm which actually occurred should have been foreseen as the kind of harm from which defendant had a duty to protect plaintiff." *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 226, 802 P.2d 1360 (1991).

Our precedent on negligent reproductive health care does not explicitly differentiate between the legal and factual components of foreseeability. However, the analysis we have employed shows that in this context, foreseeability as a question of law depends on the nature of the care sought, not the patient's reason for seeking it.

---

[5] Based on the arguments presented, *McKown* left "for an appropriate future case any inquiry concerning the circumstances under which the 'place or character' of a business can give rise to a duty to protect invitees against third party criminal conduct." 182 Wn.2d at 762.

21

*Pacheco, et al. v. United States*, No. 100526-1

In *Harbeson*, the parents "inquired about the risks of Mrs. Harbeson's taking Dilantin during pregnancy." 98 Wn.2d at 463. Given the nature of the care sought, the providers had the specific duty "to impart to their patients material information as to the likelihood of future children's being born [with congenital defects], to enable the potential parents to decide whether to avoid the conception or birth of such children." *Id.* at 472. We also explicitly discussed foreseeability in determining that the children could bring a wrongful life claim, recognizing that the providers' "duty is limited, like any other duty, by the element of foreseeability," and held that the Harbesons' "future children" were "foreseeably endangered by defendants' failure to take reasonable steps to determine the danger of prescribing Dilantin for their mother." *Id.* at 480-81. Therefore, the providers owed a duty to the children as a matter of law, even though the children had not yet been conceived at the time of the negligent acts.

In *McKernan*, the patient underwent "a sterilization operation." 102 Wn.2d at 412. Our opinion did not say why they wanted to be sterilized because it was irrelevant; the provider had a duty to perform the sterilization operation in accordance with the standard of care in order to prevent conception, regardless of the patient's motivations. In holding that ordinary child-rearing costs could not be recovered, we did not base our decision on foreseeability, and rightly so, because to say "that the expense[s] of bearing a child are remote from the avowed purpose

22

of an operation undertaken for the purpose of avoiding childbearing is a *non sequitur*." *Custodio*, 251 Cal. App. 2d at 324. Instead, our decision was based on "[u]ncertainty as to the fact of damage" and "the possibility of emotional harm to the child." *McKernan*, 102 Wn.2d at 419, 421.

In this case, following the approaches of *Harbeson* and *McKernan*, we hold that whether a duty exists as a question of law must be determined by the nature of the reproductive health care that Pacheco sought, rather than her reason for seeking it. Pacheco went to Neighborcare for contraceptive care. As a result, Neighborcare owed her a duty to provide contraceptive medication in accordance with the accepted standard of care. The United States does explain how or why this duty would change if Pacheco was at a heightened risk for having a child with congenital defects, if she had sought contraception specifically to prevent the birth of a child with congenital defects, or, indeed, if she had sought contraception for any of the other reasons a person might do so. *See Depo-Provera (contraceptive injection)*, MAYO CLINIC (Feb. 22, 2022) (In addition to preventing conception, Depo-Provera "[d]ecreases menstrual cramps and pain," "[l]essens menstrual blood flow, and in some cases stops menstruation," and "[d]ecreases the risk of endometrial cancer."), https://www.mayoclinic.org/tests-procedures/depo-provera/about/pac-20392204 [https://perma.cc/RX8W-NB8F].

23

The birth of a child with a congenital defect is, by definition, the birth of a child. The birth of a child is certainly "'within the general field of danger covered by the specific duty'" to follow the accepted standard of contraceptive care. *McKown*, 182 Wn.2d at 763 (internal quotation marks omitted) (quoting *Christen*, 113 Wn.2d at 492). Therefore, the foreseeability of S.L.P.'s PMG is not a question of law as to "whether duty exists." *Id.* at 764. Instead, it is a question of fact, which asks "whether the kind of harm which actually occurred should have been foreseen" based on the evidence presented. *Hutchins*, 116 Wn.2d at 226.

> 2.  A congenital defect does not automatically sever the chain of causation as a matter of law

The United States also contends that the element of causation is not met here because its negligence was not a proximate cause of S.L.P.'s PMG. "Proximate cause must be established by, first, a showing that the breach of duty was a cause in fact of the injury, and, second, a showing that as a matter of law liability should attach." *Harbeson*, 98 Wn.2d at 475-76. Although it is undisputed that Neighborcare's breach was a cause in fact of the plaintiffs' injuries in this case, the United States contends that S.L.P.'s PMG was "'unforeseeable, in a causal sense,'" thereby severing the chain of proximate causation as a matter of law. Def.-Appellant's Opening Br. at 42 (quoting *Maltman v. Sauer*, 84 Wn.2d 975, 982-83, 530 P.2d 254 (1975)). We disagree.

24

*Pacheco, et al. v. United States*, No. 100526-1

"The legal question whether liability should attach is essentially another aspect of the policy decision which we confronted in deciding whether the duty exists" and "involves policy considerations of how far the consequences of a defendant's acts should extend." *Harbeson*, 98 Wn.2d at 476; *Christen*, 113 Wn.2d at 508. Because of the close connection between duty and proximate cause, *Harbeson* held that "as a matter of law in wrongful birth cases, if cause in fact is established, the proximate cause element is satisfied." 98 Wn.2d at 476. Nevertheless, the United States is correct to the extent that courts applying *Harbeson* must be mindful of the context in which it was decided.

In *Harbeson*, the parents asked about the risks of taking a prescription medication during pregnancy. We held that the providers had a duty to follow the standard of care in answering the parents' questions in order to safeguard the parents' "right to prevent, either before or after conception, the birth of a" child with congenital defects. *Id.* at 472. These same policy considerations gave rise to proximate cause "as a matter of law in wrongful birth cases." *Id.* at 476. Yet, as discussed above, *Harbeson* defined the term "wrongful birth" only "[f]or the purposes of the analysis" in that case. *Id.* at 467. Not every case in which a child is born with a congenital defect fits within *Harbeson*'s definition of "wrongful birth," including this one. As a result, we recognize that an intervening cause may sever the chain of causation between a reproductive health care provider's breach

25

*Pacheco, et al. v. United States*, No. 100526-1

and a patient's injuries in some cases, in accordance with the same principles that might apply in any negligence action.

"An intervening cause breaks the chain of causation only if the intervening event is so unexpected that it falls outside the realm of the reasonably foreseeable." *Davis v. Baugh Indus. Contractors, Inc.*, 159 Wn.2d 413, 418, 150 P.3d 545 (2007) (citing *Maltman*, 84 Wn.2d at 982). Ordinarily, "[w]hether an intervening act breaks the chain of causation is a question for the trier of fact." *Id.* (citing *Maltman*, 84 Wn.2d at 982). However, the United States asks us to hold that a child's congenital defect always acts as an intervening cause as a matter of law unless (1) the provider should have known that the child was at a heightened risk for developing a congenital defect or (2) the patient sought reproductive health care for the specific purpose of preventing the birth of a child with a congenital defect. We decline to do so.

As the district court correctly ruled in this case, "[t]he risk that a child - any child - could be born with a birth defect is neither highly extraordinary nor improbable." CP at 96. This ruling was supported by unrebutted expert testimony that "[i]f a medical provider errs in the administration of contraception . . . an unintended pregnancy [is] a foreseeable consequence" and that "any pregnancy has — carries that small percentage of birth defects" in "the range of two to three percent." *Id.* at 76. To the extent the United States argues that the birth of a child

26

*Pacheco, et al. v. United States*, No. 100526-1

with congenital defects is a fundamentally different event from the birth of any other child, and is therefore unforeseeable, we reject this view. The birth of a child with congenital defects is the birth of a child.

Moreover, adopting a bright line rule that a congenital defect always acts as an intervening cause would disregard the fact that there are many types and causes of congenital defects. Some, like S.L.P.'s, are "idiopathic," meaning that the cause is unknown and the birth parent could not have done anything to predict or prevent it. *Id.* at 189. Other congenital defects have known causes and may be preventable with proper prenatal care, such as fetal exposure to communicable diseases or medication. *See Walker v. Mart*, 164 Ariz. 37, 38-39, 790 P.2d 735 (1990) ("rubella syndrome" caused by "German measles" during pregnancy); *Harbeson*, 98 Wn.2d 460 (fetal exposure to Dilantin). Still others, such as hereditary conditions, have known causes but cannot be prevented without either foregoing conception or terminating the pregnancy after prenatal testing has confirmed the presence of the defect. *See Clark*, 2011 IL 108656, ¶ 5 (hereditary "Angelman Syndrome"). Therefore, whether any particular congenital defect was brought about by an intervening cause must be determined by the facts presented.

In addition, because proximate causation ultimately depends on questions of policy, we consider Washington public policy as expressed in legislative enactments. On questions of reproductive privacy and autonomy, our legislature

27

has been clear: "It is the longstanding public policy of this state to promote access to affordable, high quality sexual and reproductive health care, including abortion care, without unnecessary burdens or restrictions on patients or providers." LAWS OF 2022, ch. 65, § 1(1). In addition, "[a]ll people deserve to make their own decisions about their pregnancies, including deciding to end a pregnancy . . . regardless of gender or gender identity, race, ethnicity, income level, or place of residence." *Id.* § 1(5). It would be directly contrary to these legislative policies to discriminate between plaintiffs based on their risk factors or motivations for seeking reproductive health care, as the United States asks us to do.

Finally, the policy considerations expressed in *McKernan* are not the same as the policy considerations in this case. *McKernan* held that ordinary child-rearing costs, such as food and clothing, could not be recovered in an action for negligent reproductive health care because "it is impossible to tell, at an early stage in the child's life, whether its parents have sustained a net loss or net gain," and attempting to do so "would carry with it the possibility of emotional harm to the child." 102 Wn.2d at 420-21. However, the plaintiffs in this case did not seek ordinary child-rearing expenses and the district court did not award any. Instead, the district court awarded "future special damages for extraordinary medical, educational, and similar expenses attributable to [S.L.P.'s] conditions," and

28

*Pacheco, et al. v. United States*, No. 100526-1

"general damages to 'compensate for mental anguish and emotional stress suffered by the parents.'" CP at 52 (quoting *Harbeson*, 98 Wn.2d at 477).

These are precisely the types of damages we permitted in *Harbeson*, "reflect[ing] a policy to compensate parents not only for pecuniary loss but also for emotional injury," as expressed by our legislature. 98 Wn.2d at 475 (discussing former RCW 4.24.010 (1973)). Awarding damages related to S.L.P.'s PMG does not reflect a determination that S.L.P.'s existence is a net loss to her parents. It merely "recognize[s] (1) that these are expenses that would not have been incurred 'but for' the defendants' negligence and (2) that they are the kind of pecuniary losses which are readily ascertainable and regularly awarded as damages in professional malpractice actions." *Turpin*, 31 Cal. 3d at 238.

Therefore, in a claim for negligent reproductive health care, a child's congenital defect does not automatically sever the chain of proximate causation as a matter of law. However, there may be intervening causes in particular cases, which must be determined on a case-by-case basis by the trier of fact.

C.     The decisions of other jurisdictions are not determinative of Washington law

Finally, the United States asserts that "[d]ecisions from other jurisdictions confirm that these general principles of tort law preclude extending liability for harms associated with plaintiff S.L.P.'s rare neurological condition." Def.-Appellant's Opening Br. at 19. Although it is worthwhile to consider the views of

29

*Pacheco, et al. v. United States*, No. 100526-1

other jurisdictions, we have long recognized that Washington legislative enactments provide "[m]ore certain guidance than that provided by decisions of other jurisdictions." *Harbeson*, 98 Wn.2d at 474.

Of the many courts that have addressed claims for negligent reproductive health care, relatively few have specifically considered whether extraordinary damages associated with a child's congenital defect may be recovered where the plaintiff did not seek care for the specific purpose of preventing the birth of a child with congenital defects. Several state supreme courts have rejected liability for such damages as a matter of law based on a proximate cause analysis that echoes the United States' position here. *See Williams v. Univ. of Chi. Hosps.*, 179 Ill. 2d 80, 87-88, 688 N.E.2d 130, 227 Ill. Dec. 793 (1997); *Pitre v. Opelousas Gen. Hosp.*, 530 So. 2d 1151, 1162 (La. 1988); *Simmerer v. Dabbas*, 89 Ohio St. 3d 586, 589-90, 733 N.E.2d 1169 (2000).

By contrast, other state supreme courts appear to permit recovery of extraordinary damages associated with a child's congenital defects regardless of the plaintiff's reason for seeking care. As noted above, Florida does not distinguish "wrongful birth" from "wrongful pregnancy." *Kush*, 616 So. 2d at 417 n.2. As a result, in all cases where negligent reproductive health care results in the birth of a child, "ordinary rearing expenses . . . are not recoverable, and only the special expenses associated with raising a [child with a congenital defect] to the

30

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

age of majority are recoverable." *Fassoulas v. Ramey*, 450 So. 2d 822, 823 (Fla. 1984). The Rhode Island Supreme Court later agreed with this approach, holding "that the reasoning of the Florida court is sound." *Emerson v. Magendantz*, 689 A.2d 409, 414 (R.I. 1997).

Thus, decisions from the highest courts of other jurisdictions are split. However, even if there were a clear majority view on this issue, we would be cautious about following other states regarding claims for negligent reproductive health care. As discussed above, different jurisdictions have taken a wide variety of approaches to such claims, and this court has already departed from the majority view by recognizing wrongful life claims. By contrast, neither Ohio nor Illinois recognizes wrongful life claims, and the Illinois Supreme Court specifically criticized our decision in *Harbeson* for reaching the opposite conclusion. *Siemieniec*, 117 Ill. 2d at 246-48; *see also Simmerer*, 89 Ohio St. 3d at 587.

We will not defer to other jurisdictions unless their analysis is consistent with Washington precedent and public policy as reflected in legislative enactments. As discussed above, the analysis urged by the United States is not. Therefore, the fact that other jurisdictions have adopted a similar analysis does not change our analysis.

31

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pacheco, et al. v. United States*, No. 100526-1

CONCLUSION

The answer to the certified question is yes. As a matter of Washington law, damages for negligent reproductive health care may include extraordinary costs associated with raising a child with birth defects, even if the plaintiff did not seek contraception to prevent conceiving a child later born with birth defects. Whether such damages should be awarded in a particular case depends on questions of fact. Whether the district court's factual findings in this case should be affirmed or reversed on appeal is an issue that goes beyond the scope of the certified question, and therefore must be resolved by the Ninth Circuit Court of Appeals.

*Pacheco, et al. v. United States*, No. 100526-1

_____
Yu, J.

WE CONCUR:

_____
González, C.J.

_____
Stephens, J.

_____
Johnson, J.

_____
Gordon McCloud, J.

_____
Madsen, J.

_____
Whitener, J.

_____
Owens, J.

_____
Mann, J.P.T.